PEOPLE v BLUME

Docket No. 93707. Argued April 2, 1993 (Calendar No. 1). Decided
August 31, 1993.

Michael D. Blume, a Florida resident, was charged in the 9-2
Judicial District Court with conspiracy to deliver or possess
with intent to deliver more than 650 grams of cocaine, and
with aiding and abetting the manufacture or possession with
intent to manufacture or to deliver more than 650 grams of
cocaine. The court, Kenneth A. Fricke, J., dismissed the
charges, concluding that because the conspiracy did not occur
in Michigan and no aid or encouragement was given in Michi-
gan, Michigan did not have jurisdiction. The Kalamazoo Circuit
Court, William G. Schma, J., reversed, ordering reinstatement
of the charges and holding both charges could be brought
because the acts in Florida were intended to produce and
actually did produce detrimental effects in Michigan. The Court
of Appeals, DOCTOROFF, P.J., and D. E. HOLBROOK, JR., and
FITZGERALD, JJ., affirmed in an unpublished opinion per curiam
(Docket No. 129818). The defendant appeals.

In an opinion by Chief Justice CAVANAGH, joined by Justices
LEVIN, BRICKLEY, and GRIFFIN, the Supreme Court held:

Michigan may exercise extraterritorial jurisdiction over acts
committed outside Michigan where the acts are intended to and
do have a detrimental effect within the state.

1. One who aids and abets the commission of a substantive
crime that occurs in Michigan is not automatically subject to
trial in Michigan. The person must have intended to aid and
abet a crime in Michigan. Mere knowledge is not enough to
permit exercise of extraterritorial jurisdiction.

2. To establish a conspiracy, there must be evidence of spe-
cific intent to combine with others to accomplish an illegal
objective. A defendant may become a member of an existing
conspiracy by coöperating knowingly to further its object. With-
out knowledge, there can be no intent. However, mere knowl-

REFERENCES
Am Jur 2d, Courts § 22, 87, 88; Criminal Law §§ 343, 345.
See ALR Index under Criminal Law; Jurisdiction.

edge of a proposed unlawful action alone is insufficient to find involvement in a conspiracy.

3. In this case, there was an insufficient factual basis to assert extraterritorial jurisdiction. There was no showing that the defendant acted with the intent to have a detrimental effect in Michigan, or that he knew of or coöperated knowingly to further the objectives of a conspiracy. In addition, the defendant had no interest in the cocaine beyond the initial sale.

Reversed.

Justice BOYLE, joined by Justices RILEY and MALLETT, dissenting, stated that the Legislature may proscribe conduct that occurs outside the physical borders of Michigan that is intended to produce and actually produces a detrimental effect in Michigan. Thus, a Florida resident may be tried in a Michigan court for conspiracy and aiding and abetting a Michigan resident in connection with the delivery of cocaine in Michigan, where the alleged agreement with, and aid to, the Michigan resident occurred in Florida. In this case, the evidence supports the magistrate's determination of jurisdiction to act.

CRIMINAL LAW — EXTRATERRITORIAL JURISDICTION.

Michigan may exercise extraterritorial jurisdiction over acts committed outside Michigan where the acts are intended to and do have a detrimental effect within the state.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *James J. Gregart,* Prosecuting Attorney, and *Joseph S. Skocelas,* Assistant Prosecuting Attorney, for the people.

*W. John Wilkinson* for the defendant.

CAVANAGH, C.J. We must decide today whether Michigan may punish acts allegedly committed in Florida by a Florida resident. We hold that Michigan may exercise extraterritorial jurisdiction over acts committed outside Michigan when the acts are intended to and do have a detrimental effect within the state. Here, the prosecutor claims that defendant was involved in a conspiracy and aided and abetted the commission of a crime in Michigan because he knew that the person to whom he sold cocaine was from Michigan. We disagree. The

"knowledge" to which the prosecutor refers only is part of the evidence necessary to support a conviction for conspiracy or aiding and abetting. But knowledge alone is not enough to exercise extraterritorial jurisdiction.[1] The prosecutor must present evidence that defendant intended to commit an act *with the intent to have a detrimental effect within this state.* That intent does not exist in this case. Accordingly, we reverse the Court of Appeals decision,[2] and reinstate the district court's dismissal of the charges.

I

Defendant, Michael Blume, is a Florida resident who is charged in Michigan with conspiracy to deliver or possession with intent to deliver more than 650 grams of cocaine[3] and with aiding and abetting the manufacture or possession with intent to manufacture or deliver 650 grams of cocaine.[4] The complaint alleges that in June, 1988, defendant sold cocaine to Randall Hoyt, a Michigan resident. The entire transaction took place in Florida.

After purchasing cocaine from defendant, Hoyt returned to Michigan. The Michigan State Police

---

[1] As discussed below, knowledge alone in this case similarly is not enough to convict defendant of conspiracy or aiding and abetting.

[2] It must be noted that the Court of Appeals misstated the facts, which it found "sufficient to establish that defendant's conduct in Florida was done with intent to produce and did produce detrimental effects within Michigan." Unpublished opinion per curiam, decided January 15, 1992 (Docket No. 129818), p 1. The Court of Appeals stated "Hoyt testified that defendant knew that Hoyt was from Michigan and that Hoyt would be going back in several days. Hoyt explained to defendant that he was splitting up the cocaine with another individual in Michigan." *Id.* First, Hoyt never testified. Furthermore, the officer also admitted that Hoyt may have dumped the cocaine in the ocean. Apparently, Hoyt was unsure himself of where the cocaine would be distributed.

[3] MCL 750.157a; MSA 28.354(1).

[4] MCL 333.7401(2)(a)(i); MSA 14.15(7401)(2)(a)(i).

subsequently arrested Hoyt upon discovering a kilo of cocaine during a search of Hoyt's apartment. Hoyt informed the police that he purchased the cocaine from defendant while in Florida. The prosecutor filed a complaint charging defendant. After being arraigned, defendant moved to quash the complaint and charges for lack of jurisdiction.

Officer Palenick was the only prosecution witness who testified at the hearing on the motion to quash for lack of jurisdiction. He explained that Hoyt told him that he traveled to Florida intending to purchase cocaine from a prearranged supplier. Unable to find his connection, Hoyt began looking for a new supplier. Hoyt met up with defendant. Apparently, the two had met each other previously through a gym at which both exercised. Hoyt and defendant made arrangements for the sale of cocaine. The entire transaction took place in Florida. Defendant did not have any contact with Hoyt while Hoyt was in Michigan before the sale. Officer Palenick testified that Hoyt said that defendant was aware that he was from Michigan.

After Officer Palenick and defendant testified at the hearing, the trial court dismissed the charges for lack of jurisdiction, finding that if any conspiracy occurred involving defendant, it occurred in Florida, and that defendant did not give aid or encouragement in Michigan. The circuit court reversed and ordered reinstatement of the charges upon finding that defendant's acts were intended to and actually did produce detrimental effects in Michigan. The Court of Appeals affirmed.[5] We granted leave to appeal, and, upon finding the exercise of extraterritorial jurisdiction in this case inappropriate, we reverse and order reinstatement of the trial court's dismissal of the charges.

[5] See n 2.

II

The general rule is that jurisdiction is proper only over "offenses as may be committed within its jurisdiction." *People v Devine,* 185 Mich 50, 52-53; 151 NW 646 (1915). The authority to exercise jurisdiction over acts that occur outside the state's physical borders developed[6] as an exception to the rule against extraterritorial jurisdiction. That exception, however, is "limited to those acts that are intended to have, and that actually do have, a detrimental effect within the state." *Strassheim v Daily,* 221 US 280, 285; 31 S Ct 558; 55 L Ed 735 (1911); *Deur v Newaygo Sheriff,* 420 Mich 440, 446-447; 362 NW2d 698 (1984).

This state has not defined the boundaries of the exception,[7] but consistently has required a finding that the actor intended a detrimental effect to occur *in this state.* See, e.g., *Deur, supra.* The two key elements of that requirement are specific in-

[6] See *Sexton v Ryder Truck Rental, Inc,* 413 Mich 406, 434; 320 NW2d 843 (1982). Perhaps more pragmatically, we recognize that "[m]odern criminals have little concern for political boundaries except as such boundaries are an aid in effecting a criminal purpose." Berge, *Criminal jurisdiction and the territorial principle,* 30 Mich L R 238 (1931). Moreover, "[i]n a broader sense, the factors of interstate population centers, organized crime, mobility, and recidivism reveal that each state has an interest in crimes committed in other states." Rotenberg, *Extraterritorial legislative jurisdiction and the state criminal law,* 38 Tex L R 763, 766-767 (1960). Thus, blind adherence to a purely territorial concept of jurisdiction inadequately addresses the state's interest in protecting its citizens from the results of criminal activity.

[7] The common law is the law of the state unless abrogated or changed by the constitution, the Legislature, or the Court. Const 1963, art 3, § 7; *People v Stevenson,* 416 Mich 383, 389; 331 NW2d 143 (1982). Unlike some states, Michigan has not enacted legislation generally defining the reach of its criminal statutes. But see MCL 762.6; MSA 28.849 (allowing prosecution in Michigan for mortal wound inflicted by one "within or without the limits of this state"); MCL 767.64; MSA 28.1004 (allowing prosecution in Michigan for property stolen in "any other state or country" and brought into Michigan).

tent to act and the intent that the harm occur in Michigan.[8]

A proper analysis for this Court is to determine whether a conspiracy or aiding and abetting charge could be established by the evidence. Then, the Court must determine whether the conspiracy or crime that was aided and abetted was intended to occur in Michigan.[9]

### III

" 'A conspiracy is a partnership in criminal purposes.' " *People v Atley,* 392 Mich 298, 310; 220 NW2d 465 (1974) (quoting *United States v Kissel,* 218 US 601, 608; 31 S Ct 124; 54 L Ed 1168 (1910). "The gist of the offense of conspiracy lies in the unlawful agreement between two or more persons." *Atley* at 311.[10] Establishing a conspiracy requires evidence of specific intent to combine with others to accomplish an illegal objective. *Atley* at 310.

### A

First, the intent to combine with others for an

[8] The dissent asks us to ignore the intent requirement and create a less stringent standard by holding that the intent and the detrimental effect in this case are established because defendant *knew* that the cocaine purchaser was from Michigan and therefore, defendant *intended* a detrimental effect to occur in Michigan. We must reject the dissent's conclusion that the knowledge was sufficient in this case to support finding intent.

[9] The dissent attempts to base its conclusion on the case's procedural disposition. The dissent argues that the issue here is whether a warrant shall issue, and the factors to consider are "whether the warrant was supported by sufficient probable cause to believe that '(1) an offense has been perpetrated; (2) defendant has committed it; and (3) the magistrate has jurisdiction to act in the case.' " *Post* at 497. But the dissent fails to realize that regardless of when jurisdiction is challenged, the *Strassheim* test must be met.

[10] See also *People v Asta,* 337 Mich 590, 611; 60 NW2d 472 (1953); *People v Smith,* 296 Mich 176; 295 NW 605 (1941).

unlawful purpose must exist. Even if one party intends to combine to pursue an unlawful purpose, " '[t]o prove the crime of conspiracy, . . . it must further be proven that that intent, *including that knowledge,* was possessed by more than one individual since there can be no conspiracy without a combination of two or more[11] persons.' " *People v Sutherlin,* 116 Mich App 494, 500; 323 NW2d 456 (1982) (emphasis added).[12]

In *Atley,* this Court held that there was insufficient evidence to support convicting the defendant of conspiracy to deliver an illegal substance because there was insufficient evidence that two or more parties agreed to sell the marijuana. Atley, along with two other defendants, was arrested for possession of 127 pounds of raw marijuana. He was charged with conspiracy to sell a narcotic drug. The prosecutor alleged that the defendants were going to harvest a marijuana field in Kansas and sell the marijuana in Michigan.

Regarding the evidence, the trial judge explained:

"I have some difficulty in bridging the gap between being hired [to] harvest a crop for delivery to a person who has expressed an intention that he was going to dry it and sell it, but without any agreement or any conversation as to participation

---

[11] An agreement to commit a particular crime cannot be prosecuted as a conspiracy where the number of alleged conspirators do not exceed the minimum number of persons logically necessary to complete the substantive offense. *People v Hamp,* 110 Mich App 92; 312 NW2d 175 (1981). Conspiracy to deliver controlled substances is one of those crimes. In *People v Puig,* 85 Misc 2d 228, 232; 378 NYS2d 925 (1976), the court explained "an agreement solely between seller and buyer to transfer narcotics is not sufficient to establish conspiracy to commit the sale, as the consummated crime necessarily involved the co-operation of the two persons (*People v Potwora,* 44 AD2d 207 [354 NYS2d 492 (1974)])."

[12] See also *People v Atley, supra* at 310; *People v Di Laura,* 259 Mich 260; 243 NW 49 (1932).

in the actual sale, being sufficient to establish a
conspiracy, which is an agreement or an under-
standing to make a sale." [*Id.* at 313.]

This Court explained that the evidence was not
"strong enough to sustain[13] the conviction for
conspiracy to sell marijuana." *Id.*

> The "prior combination and agreement" to har-
> vest plus the testimony that defendant Atley in-
> tended to sell the marijuana do not directly estab-
> lish in logic that the defendant and Eaton or any
> other person *agreed to sell* the marijuana. There
> was, in fact, no testimony . . . that Eaton *agreed*
> with defendant *to sell* the marijuana.
>     . . . From the established fact of acquisition of
> 127 pounds of marijuana, we can infer an intent to
> sell, but that is as far as inference may take us.
>     It is not "a fair inference," [*People v Beller,* 294
> Mich 464; 293 NW 720 (1940)]; *People v Sobczak,*
> 344 Mich 465; 73 NW2d 921 (1955), to infer the
> ultimate fact of conspiracy to sell from the fact of
> joint acquisition. The ultimate fact of intent to sell
> might be inferred, but not agreement to sell. What
> they actually intended to do insofar as payment
> was concerned, or insofar as where the marijuana
> was to be sold, whether in Michigan or elsewhere,
> is on this record a matter of conjecture. [*Id.* at
> 314.]

## B

A defendant may become a member of an al-
ready existing conspiracy if he " '*coöperates know-*

---

[13] The Court of Appeals held that a " 'jury could infer the existence
of the agreement necessary to the charge from the prior preparation
and planning engaged in by the parties and disregard the denials of
defendant's alleged coconspirators. While it may have been designed
that only defendant would sell the marijuana, the prior combination
and agreement to receive proceeds by those involved was reasonably
established and certainly points to the existence of the charged
conspiracy.' " *Id.* at 313.

*ingly to further the object of the conspiracy . . . .' " People v Huey,* 345 Mich 120, 125; 75 NW2d 893 (1956) (emphasis added). The "knowledge" is a part of the crime only because "[w]ithout the knowledge, the intent cannot exist. *United States v Falcone* [311 US 205; 61 S Ct 204; 85 L Ed 128 (1940)]." *Direct Sales Co v United States,* 319 US 703, 711; 63 S Ct 1265; 87 L Ed 1674 (1943). Mere knowledge that someone proposes unlawful action alone is not enough to find involvement in a conspiracy, however. "Those having no knowledge of the conspiracy are not conspirators, *United States v Hirsch,* 100 US 33, 34 [25 L Ed 539 (1879)]; *Weniger v United States,* 47 F2d 692, 693 [CA 9, (1931)]; and one who without more furnishes supplies to an illicit distiller is not guilty of conspiracy even though his sale may have furthered the object of a conspiracy to which the distiller was a party but of which the supplier had no knowledge." *Falcone* at 210-211.

The dissent cites *Direct Sales* to support the proposition that defendant can become involved in the conspiracy through informed or interested coöperation. But the dissent relies on one short sentence of that opinion in so holding. In *Direct Sales,* the United States Supreme Court also recognized that "[t]here may be circumstances in which the evidence of knowledge is clear, yet the further step of finding the required intent cannot be taken. Concededly, not every instance of sale of restricted goods, harmful as are opiates, in which the seller knows the buyer intends to use them unlawfully, will support a charge of conspiracy." *Id.* at 712.

There are circumstances, however, such as in *Direct Sales,* that jurisdiction is appropriate. For example, if "the evidence discloses such a [distribution] system, working in prolonged coöperation

with a physician's unlawful purpose to supply him with his stock in trade for his illicit enterprise, there is no legal obstacle to finding that the supplier not only knows and acquiesces, but joins both mind and hand with him to make its accomplishment possible." *Id.* at 713. It was under those circumstances that the United States Supreme Court said there was "informed and interested coöperation, stimulation, instigation [of the conspiracy] [a]nd there is also a 'stake in the venture' . . . ." *Id.*

The United States Supreme Court also provided additional guidance about what amount of evidence is required by explaining *Falcone:*

> That decision comes down merely to this, that one does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally. [*Id.* at 709.]

Clearly, the prosecutor must present more evidence than the seller's knowledge of the buyer's proposed illegal purpose. For intent to exist, the defendant must know of the conspiracy, must know of the objective of the conspiracy, and must intend to participate coöperatively to further that objective. " '[T]o establish the intent, the evidence of knowledge must be clear, not equivocal . . . because charges of conspiracy are not to be made out by piling inference upon inference . . . .' " *Atley* at 310, quoting *Direct Sales Co, supra.*[14]

---

[14] This Court stated in *Atley* at 314-316, that a conspiracy may be established by circumstantial evidence or an inference, provided that the evidence and circumstances are " 'within safe bounds of relevancy and be such as to warrant *a fair inference of the ultimate facts.*'

C

Because of the jurisdictional dispute, the prosecutor also must establish an intent to combine with others for the unlawful purpose of possessing cocaine or possessing with the intent to deliver the cocaine *in Michigan.* The "threshold question for assertion of the state's jurisdiction is whether there is a showing sufficient to permit the court to conclude that the defendant intended to produce a detrimental effect in the forum state." *Post* at 510.

In *United States v Baker,* 609 F2d 134 (CA 5, 1980), the court applied extraterritorial jurisdiction to a case involving conspiracy and illegal possession with intent to distribute narcotics. But the *Baker* court specifically held that if "it is clear that the intended distribution would occur within" the jurisdiction attempting to punish the defendant, then "jurisdiction may be maintained . . . ." *Id.* at 139.

This state will not surrender a person charged with a crime in another state unless the defendant clearly committed a crime with the intent that the crime occur in the demanding state.[15] In *Deur,*

(Emphasis added.)" *Id.* at 311, quoting *People v Beller, supra* at 469. Although the agreement does not have to be established by direct proof, creating an inference upon an inference clearly is impermissible.

[15] *Deur* at 444-446, interpreting MCL 780.3a; MSA 28.1285(3-1/2), which provides:

The governor of this state may also surrender, on demand of the executive authority of any other state, any person in this state charged in such other state in the manner provided in section 3 with committing an act in this state, or in a third state, intentionally resulting in a crime in the state whose executive authority is making the demand, and the provisions of this act not otherwise inconsistent shall apply to such cases, even though the accused was not in that state at the time of the commission of the crime, and has not fled therefrom, and the requirements contained in subdivisions (d) and (e) of section 3 of this act shall not apply to such cases.

*supra* at 449, this Court refused to surrender the defendant because he "did not commit any act in the State of Michigan intentionally resulting in the crime with which he is charged in the State of Maryland."[16] Thus, this Court should not approve the exercise of jurisdiction over a person who committed a crime outside Michigan when this state cannot prove that the person intended the crime to occur in this state.

IV

A thorough review of the testimony fails to disclose evidence sufficient to support exercising jurisdiction over this defendant.[17] The prosecutor did not present evidence that defendant[18] acted with the intent to have a detrimental effect in Michigan. Conversely, defense counsel introduced testimony that negated the existence of such intent. Similarly, the prosecutor did not present sufficient evidence that defendant knew of or coöperated knowingly to further the objectives of a conspiracy.

This case involves defendant's sale of cocaine to Randy Hoyt. Hoyt traveled to Florida, intending to purchase cocaine from someone other than defendant,[19] and defendant's only prior contact with

[16] Not only must the Court find an intentional act, but the Court must find the intention to commit an act that would result in a crime *in the demanding state.*

[17] We review the district court's assumption of jurisdiction de novo . . . . [*United States v Hill,* 719 F2d 1402, 1404 (CA 9, 1983).]

[18] Because this case did not reach trial, it only is alleged that defendant committed a crime. For purposes of determining if jurisdiction over defendant is appropriate, we must start with the premise that defendant made the initial sale of cocaine to Hoyt. There is testimony to support that assumption.

[19] During the hearing on the motion to dismiss for lack of jurisdic-

Hoyt was through a gym.[20] Although defendant

tion, which took place on October 5, 1988, the only witnesses to testify were defendant and Officer Palenick. Regarding Mr. Hoyt's intentions when he traveled to Florida, the officer testified:

[*Prosecutor*]: [D]id [Mr. Hoyt] tell you who he went down there [Florida] initially to meet?

[*Officer*]: Yes, he advised that he initially went down to make contact with a subject that he described as Little Mike.

\* \* \*

[*Prosecutor*]: And what did he tell you with respect to his search for Little Mike and the intention of purchasing cocaine from him?

[*Officer*]: He was not able to locate Little Mike.

[*Prosecutor*]: What did he tell you he did instead?

[*Officer*]: He went to a restaurant, after which he was able to make contact with another subject.

\* \* \*

[*Prosecutor*]: Did he tell you how he knew this other subject?

[*Officer*]: He said that he has worked out with him at the gym and he was aware that he could also make a contact with this individual, possibly to obtain a product that he needed.

[20] The transcript continues:

[*Defense Counsel*]: Did you meet a man by the name of Mr. Hoyt in Florida?

[*Defendant*]: Well, he came to Florida where I was at and he walked in and he met me there. That is, you know, how I met him.

\* \* \*

I met him through a friend that I work with named Alfred Fricke at J. W. House of Rock.

\* \* \*

[*Defense Counsel*]: Did you have occasion to call Hoyt at any time when Hoyt was located in Michigan?

[*Defendant*]: No.

\* \* \*

[*Defense Counsel*]: Would you have any reason to know where he [Hoyt] would be calling from if he did call you?

[*Defendant*]: No, sir.

\* \* \*

[*Defense Counsel*]: Did you have any idea in advance of running into him, that he was coming to Florida?

[*Defendant*]: No idea, I had not seen him for maybe a year before that.

knew that Hoyt was from Michigan and that Hoyt eventually would return to Michigan, defendant only was involved in the initial delivery of cocaine to Hoyt.[21] The transaction was completed in Flor-

[Defense Counsel]: Now, did you ever make a plan with Hoyt to come up here to Michigan?
[Defendant]: No.

\* \* \*

[Prosecutor]: How did you come to see Mr. Hoyt in the Whale's Rib Restaurant in June of this year?
[Defendant]: This year, I was just sitting there eating and he walked in and he was, you know, in a muscle shirt and we were both body builders and we started talking about body building. That is how we started speaking.
[Prosecutor]: You say that you first met him how many years ago?
[Defendant]: I am not exactly sure. Between two and three years ago I met him.
[Prosecutor]: How many times have you met him?
[Defendant]: Met him?
[Prosecutor]: Face-to-face.
[Defendant]: Three to four times.
[Prosecutor]: Other than this time in June, when was the last time before that, how long had it been?
[Defendant]: Probably about maybe two years prior, before that, that is all.

\* \* \*

[Prosecutor]: You saw him mostly in '85 and '86 and not again until June of '88?
[Defendant]: Yes.
[Prosecutor]: At that point you immediately recognized who he was?
[Defendant]: Yes.
[Prosecutor]: Did you agree to meet him at all as you were at Whale's Rib Restaurant? Did you meet again the next day, or . . .
[Defendant]: No.

[21] It must be noted that the only evidence supporting this fact is the hearsay testimony of Officer Palenick, who testified that Hoyt told him that he purchased the cocaine from defendant. The officer admits, however, that there is no evidence to "contradict that possibility that Mr. Hoyt left Florida with a quantity of cocaine and unloaded it somewhere along the way and picked up some more before he came back to Michigan?" That possibility is feasible in light of the officer's testimony that Hoyt told defendant he would be in Florida several days before returning to Michigan.

ida as evidenced by the fact that delivery was complete and the financial aspects of the sale were concluded.[22]

Although we may infer from the amount of the cocaine purchased that the buyer intended to possess or sell the cocaine somewhere, *Atley, supra,* the prosecution's only witness, Officer Palenick, was unable to testify that Hoyt told defendant that the drugs would be distributed in Michigan.[23] The officer did testify that Hoyt could have disposed of the cocaine in any manner and no agreement would have been breached.[24] For that to be

---

[22] This testimony was introduced on cross-examination of Officer Palenick.

> [*Defense Counsel*]: So there isn't reason there to assume, is there, that he had more money coming?
> [*Officer*]: You are referring to?
> [*Defense Counsel*]: The Defendant. There is no reason to assume that Hoyt . . .
> [*Officer*]: . . . Still owes him money for the drugs?
> [*Defense Counsel*]: Yes.
> [*Officer*]: No, I would think not.

[23] The only testimony regarding distribution came on *direct* examination.

> [*Prosecutor*]: Did Randy Hoyt indicate to you whether or not he had explained to the Defendant that the cocaine was to be delivered and distributed in Michigan?
> [*Officer*]: *I don't recall if Mr. Hoyt advised that he was going to be distributing in Michigan.* He did advise that he lived in Michigan and he had another person that he *may* be splitting it with when he got back to Michigan. [Emphasis added.]

Thus, the district judge erroneously stated that defendant and Hoyt "did discuss the sale of cocaine by Defendant to Randy Hoyt for the purpose of transporting it to Michigan *to be delivered, sold* . . . ." There is no testimony on the record supporting the judge's statement. A judge's finding may be overruled for want of any evidence. Because there is no evidence, we cannot affirm the district court's finding of fact.

[24] On cross-examination defense counsel asked:

> [*Defense Counsel*]: . . . would it be contrary to any agree-

true, there must not have been an agreement regarding what Hoyt would do with the cocaine.

Also relevant is that the defendant did not have an interest in the cocaine beyond the initial sale. Defendant was not concerned with Hoyt's use of the cocaine, and was not concerned with where Hoyt took the cocaine. More importantly, defendant did not intend that the cocaine go to Michigan, and did not intend that the drugs be sold in Michigan.[25] Mere knowledge that Hoyt would return to Michigan sometime after completing the transaction with defendant is insufficient to support finding that defendant specifically intended to have a detrimental effect in this state.[26]

Although an inference may be drawn, and in some cases knowledge and the surrounding circumstances may be sufficient to support a finding of intent, *Direct Sales, supra,* the dissent's conclusion[27] here violates the principle that inference is

> ment that Hoyt had with his purchaser if Hoyt had taken it and dumped it into the ocean, so to speak?
>
> [*Officer*]: . . . yes, it would be possible.
>
> [*Defense Counsel*]: My point is it would not have violated any agreements that he had with the person that he got it from?
>
> [*Officer*]: Not that I know of.

Although the officer testified that the defendant "knew" Hoyt was from Michigan and that he "knew" that Hoyt would eventually return to Michigan, the officer was unable to testify or affirm that the defendant made an agreement regarding where the cocaine would be distributed. The officer made it clear that there was no agreement between defendant and Hoyt that the drugs would be taken to and sold in Michigan.

[25] This does not mean that in every case involving the distribution of cocaine the court is unable to exercise jurisdiction. It only means that the prosecutor failed to present evidence sufficient to establish the requisite intent in this case. See *Direct Sales, supra.*

[26] The prosecutor admitted in his closing argument that defendant, at most, only "knew" that the cocaine would be taken to Michigan. Nonetheless, the officer's testimony is inconsistent regarding whether defendant knew Hoyt was taking the cocaine back to Michigan.

[27] The dissent concludes that defendant knew that Hoyt later intended to possess and sell the cocaine in Michigan and, thus, that

not to be created upon inference to support a conspiracy charge. *Direct Sales Co, supra.* The inference upon inference the dissent built includes an inference that defendant knew Hoyt was going to sell the drugs, an inference that Hoyt had a plan to sell the drugs, an inference that the plan involved another person so as to create a conspiracy, an inference that Hoyt's plan or conspiracy was to sell the drugs in Michigan, and an inference that defendant, by the mere delivery of the cocaine to Hoyt and knowledge that Hoyt was *from* Michigan, knew of and coöperated *knowingly* with these inferred states of mind.

But the prosecutor failed to introduce evidence that defendant and Hoyt agreed, or even discussed, that the cocaine would be distributed in Michigan.[28] The prosecutor also failed to introduce evidence that defendant was aware that Hoyt was involved in a conspiracy.[29] There is no evidence

defendant provided informed and interested coöperation in Hoyt's plan. Therefore, this state may prosecute Blume for conspiracy. The dissent confuses the evidence necessary to support exercising extraterritorial jurisdiction with the evidence necessary to support a conviction for conspiracy. *Post* at 506. The dissent relies on discussions between defendant and Hoyt regarding potential future sales of cocaine to establish the existence of facts contributing to the conspiracy. This reliance is inappropriate, however, because the officer admitted that "[t]here was not any firm commitment according to Mr. Hoyt. He said that I have got somebody coming up here for some other business; if at that time we can work it out, I will have him drop off two kilos close by and maybe you can pick him up."

[28] Although the dissent correctly states that a formal agreement does not have to be shown, the only prosecution witness in this case clearly negated the existence of an agreement. Furthermore, the dissent consistently repeats that defendant knew that the cocaine would be distributed in Michigan, but there is no evidence that Hoyt intended to distribute the cocaine in Michigan, let alone that defendant knew of such intention.

[29] It is true that the defendant does not have to know all the potential ramifications of the conspiracy, but the defendant does have to know that there is a conspiracy and the objective of that conspiracy before this Court can hold that he "coöperates knowingly to further the object of the conspiracy." *People v Huey, supra* at 125. The dissent's conclusion, therefore, is inconsistent with the principles

that defendant knew Hoyt had a plan. It is questionable whether Hoyt knew he had a plan. There is no evidence that defendant knew Hoyt was going to sell the cocaine in Michigan.

After reviewing *Direct Sales, Falcone, Deur, Atley,* and *Huey,* we can only conclude that the facts do not provide a sufficient basis for concluding that defendant knew of or coöperated knowingly with a conspiracy to further its objectives.[30]

V

The reasoning used in the conspiracy discussion applies to the substantive charge brought under

of law on which it relies. The dissent states that intent is required, and although " 'knowledge is the foundation of intent,' . . . mere knowledge of a conspiracy or its illegal objective, without more, is not enough to prove intent . . . ." *Post* at 507. The dissent should have stopped right there because the defendant did not have knowledge of the conspiracy or its illegal objective; therefore, it is irrelevant and unnecessary to "examine the defendant's conduct to determine whether the defendant provided 'informed and interested coöperation, stimulation, [or] instigation.' " *Post* at 507-508.

[30] We do not seek to limit the ability to exercise extraterritorial jurisdiction in illegal drug sale cases or in other types of cases. The problem here, which bars jurisdiction, is that the defendant did not act alone, but the involvement with Hoyt was not enough to permit transferring Hoyt's intentions, whatever they were, to this defendant. Quite simply, neither conspiracy nor aiding and abetting can be made out here. This does not mean jurisdiction will never be obtained in such unique circumstances. For example, if someone stood blindfolded at the point connecting Arizona, New Mexico, Utah, and Colorado, and fired a machine gun while making a 360 degree turn, then whatever state in which the defendant may murder a person, that state should have jurisdiction over defendant. In that case, the defendant's intent is sufficient under criminal laws addressing murder. But here, the defendant's sale of cocaine is insufficient under criminal law regarding conspiracy or aiding and abetting. Defendant's intent was to sell cocaine in Florida. He did not commit an act that forced or encouraged the cocaine to leave Florida, did not encourage Hoyt to take the cocaine outside Florida, and did not engage in a continuous distribution network with Hoyt. The facts here indicate that defendant was a fill-in seller for Hoyt's regular scheme, about which defendant had no knowledge. Without additional facts, jurisdiction is inappropriate. The outcome certainly would be different if defendant was Hoyt's regular supplier, was involved beyond this one transaction, or had discussed Hoyt's conspiracy.

the aiding and abetting theory. Consistent with *Strassheim, supra,* the defendant must have intended a detrimental effect to occur in Michigan and the effect actually must have occurred in Michigan before this Court can exercise jurisdiction over a defendant who aided and abetted outside Michigan.

One who aids and abets the commission of a substantive crime that occurs in Michigan is not automatically subject to trial in Michigan. Defendant must have intended to aid and abet a crime in Michigan. Mere knowledge is not enough to exercise jurisdiction.[31]

## VI

Because there is an insufficient factual basis to assert extraterritorial jurisdiction over this defendant, we reverse the Court of Appeals decision, and reinstate the district court's dismissal of the charges.

LEVIN, BRICKLEY, and GRIFFIN, JJ., concurred with CAVANAGH, C.J.

BOYLE, J. (*dissenting*). The principle issue that divides the majority and minority opinions is whether the state must show, as a jurisdictional fact, that the defendant intended the drugs he sold in Florida to be distributed in Michigan. Because the harmful consequence that defendant intended and that actually occurred in Michigan was possession of the drugs in Michigan, we would hold that

---

[31] Interestingly, the record is devoid of evidence that the drugs actually were sold in Michigan, which directly confronts the prosecutor's statement that "anybody that intentionally sends drugs to Michigan, *have them sold here,* is just as liable for having the drugs in our State as those that bring them here and those that sell them . . . ."

the defendant may be tried in a Michigan court for conspiracy to possess and for the possession of cocaine in Michigan on an aiding and abetting theory, where the alleged agreement with, and aid to, the Michigan resident occurred in Florida. We would affirm the decision of the Court of Appeals, reinstate the complaint, and remand this case for a preliminary examination.

I

Defendant Michael Blume is a Florida resident charged in a two-count information with conspiracy to deliver or possess with intent to deliver more than 650 grams of cocaine,[1] and the manufacture or possession with intent to manufacture or to deliver more than 650 grams of cocaine under an aiding and abetting theory.[2] The charges stem from a June, 1988, incident involving Blume's alleged sale of cocaine in the State of Florida to Randall Hoyt, a resident of the State of Michigan.[3]

Hoyt was arrested by the Michigan State Police after a search of his apartment and business yielded approximately one kilogram of cocaine. He revealed the identity of his source, and a warrant was issued for Blume's arrest.

[1] MCL 750.157a; MSA 28.354(1).

[2] MCL 333.7401(2)(a)(i); MSA 14.15(7401)(2)(a)(i).

[3] Contrary to the majority's suggestion, *ante*, p 482, n 11, defendant has not been charged with conspiracy to deliver narcotics to Hoyt in Florida or in Michigan. Defendant is charged with conspiracy to deliver or possess with intent to deliver, and possession with intent to deliver does not logically require two persons for its completion.

A conspiracy between Hoyt and his Michigan partner already existed before Hoyt traveled to Florida to purchase cocaine. It is this preëxisting Michigan conspiracy that the prosecutor alleges that Blume became a member of by allegedly selling cocaine to Hoyt in Florida. As the majority recognizes, "[a] defendant may become a member of an already existing conspiracy if he ' "coöperates knowingly to further the object of the conspiracy. . . ." ' " *Ante,* pp 483-484 (citations omitted).

Blume was arrested in Florida and was arraigned in Michigan. After the arraignment, the district court held an evidentiary hearing on his motion to quash the warrant and complaint for lack of jurisdiction.[4]

Regarding the conspiracy charge, the court found that Hoyt and another resident of Michigan agreed that Hoyt would travel to Florida, purchase one kilogram of cocaine, and return to Michigan to divide the cocaine with his friend. The court found that "the Defendant did have [a] discussion with Randy Hoyt, [and] that they did discuss the sale of cocaine by Defendant to Randy Hoyt for the purpose of transporting it to Michigan to be delivered, sold, possessed . . . ."

In addition, the record reflects that in his statement to police investigators, Hoyt indicated that a later conversation with Blume contemplated the purchase of more cocaine for delivery in Michigan or Chicago, Illinois. The record also indicates that Blume acknowledged having had prior contacts with Hoyt, and that Blume admitted to phone contact with Hoyt in July or August, 1988, a conversation apparently instigated by law enforcement officers some time after the search warrant had been executed in Michigan.

Regarding the substantive count brought under an aiding and abetting theory, the district court found

that Mr. Hoyt had possession of cocaine, that he intended to deliver it, sell it, that he obtained that cocaine in Florida from Mr. Blume, that Mr. Blume sold it to him knowing that he was going to transport it to Michigan and sell it. . . .

---

[4] The content of Hoyt's statements to law enforcement officers was admitted through the testimony of the officer who had interviewed him.

The Defendant, under the facts as I understand them, did aid and assist Mr. Hoyt in having cocaine in the State of Michigan for the purpose of delivering it. I think that a supplier, one who supplies cocaine to another, does aid and abet that person in having possession of the controlled substance with the intent to manufacture or deliver it.

The court dismissed the charges, however, and concluded that because the conspiracy did not occur in Michigan, and because no aid or encouragement was given in Michigan, Michigan did not have jurisdiction to proceed.

The circuit court reversed and ordered reinstatement. It held that both charges could be brought because they were the result of acts done in one state that were intended to produce and actually did produce detrimental effects in Michigan. The Court of Appeals affirmed the circuit court's decision in an unpublished opinion per curiam, decided January 15, 1992 (Docket No. 129818) at 1. We granted leave to appeal. 441 Mich 880 (1992).

II

The majority's analysis of the evidence obscures the fact that the defendant's motion to quash the complaint and warrant challenged only the magistrate's determination of jurisdiction. As such, it is only necessary to determine here whether the warrant was supported by sufficient probable cause to believe that "(1) an offense has been perpetrated; (2) defendant has committed it; and (3) the magistrate has jurisdiction to act in the case."[5]

─────────────
[5] *People v Franklin*, 117 Mich App 393, 396; 323 NW2d 716 (1982). See also MCL 767.3; MSA 28.943.

Defendant bears the burden of establishing a ground for quashing the complaint and warrant.[6]

Thus, while the initial questions presented are the power of the Legislature to proscribe conduct that occurs outside its borders and the intent of the Legislature to give the conspiracy and aiding and abetting statutes extraterritorial effect, the ultimate inquiry is whether the magistrate properly determined jurisdiction to act in the case, which in turn rests on whether the defendant intended to produce a detrimental effect in Michigan.

On review of the grant or denial of a motion to quash, we do not weigh the evidence but only determine whether there is any evidence supporting the charge. Where the challenge is to the magistrate's jurisdiction to act, we review only to determine whether there is any evidence to support the magistrate's determination that probable cause existed to believe the defendant intended to produce a detrimental effect in Michigan. Disputed issues of fact are to be resolved by a properly instructed jury.[7]

---

[6] See MCL 767.74; MSA 28.1014, which provides that "[n]o motion to quash . . . the indictment, shall be received by any court unless the party offering such plea shall prove the truth thereof by affidavit, or by some other sworn evidence." See also *Gridley v United States,* 44 F2d 716 (CA 6, 1930), cert den 283 US 827 (1931).

While it is true that the statute refers to motions to quash an indictment, " '[i]ndictment' means an indictment, information, presentment, complaint, warrant, and any other formal written accusation and, unless a contrary intention appears, means any count thereof." MCL 761.1(d); MSA 28.843(d).

[7] *People v Webb,* 163 Mich App 462; 415 NW2d 9 (1987). See also *Commonwealth v Bighum,* 452 Pa 554, 559; 307 A2d 255 (1973) ("Jurisdiction is a legal issue and therefore is not normally a concern for the jury. However, in those infrequent cases where jurisdiction depends upon the resolution of disputed facts, it is within the province of the jury to resolve the issue under proper instructions").

Indeed, even the Court in *Strassheim v Daily,* 221 US 280; 31 S Ct 558; 55 L Ed 735 (1911), recognized that the resolution of disputed facts was for the jury when it noted that if the jury believed that the

### III

Although discussion of the Legislature's power to proscribe conduct that occurs outside its borders frequently occurs in the international law arena, the theories of legislative jurisdiction are the same whether applied between the United States and other sovereign nations or between the sovereign states.[8]

Unless a legislature has the power to enact the statute that seeks to proscribe extraterritorial conduct, the state may not enforce it for acts committed outside its territory. Whether the legislature possesses that power depends on various recognized principles on which the power to proscribe extraterritorial conduct is based.[9]

While neither courts nor commentators agree on the number or names assigned to the principles governing the exercise of legislative criminal jurisdiction,[10] the most often recognized bases for exercise are:

---

defendant had committed the acts complained of, Michigan would be justified in punishing the defendant. Similarly, if the jury in this case believes that Blume knew that Hoyt would be returning to Michigan to split the cocaine with another, and armed with that knowledge, supplied the cocaine to be split to Hoyt, then the intent to create a detrimental effect in Michigan, here the further distribution of cocaine, would be shown.

We also note a conflict among the various states regarding quantum of proof necessary to prove jurisdiction. See anno: *Comment note— necessity of proving venue or territorial jurisdiction of criminal offense beyond reasonable doubt,* 67 ALR3d 988. The parties have neither argued nor briefed this issue, thus its resolution must await another case in which the issue is clearly presented.

[8] Rotenberg, *Extraterritorial legislative jurisdiction and the state criminal law,* 38 Tex L R 763, 767-768 (1960).

[9] *United States v Smith,* 680 F2d 255, 257 (CA 1, 1982), cert den 459 US 1110 (1983); *Rivard v United States,* 375 F2d 882, 885 (CA 5, 1967), cert den sub nom *Giroleau v United States,* 389 US 884 (1967).

[10] See, e.g., *Smith,* n 9 *supra* at 257 (recognizing six bases: territorial, national, protective, universal, passive personality, and objective territorial); *Rivard,* n 9 *supra* at 885 and ns 5-9 (recognizing five bases: territorial, national, protective, universality, and passive per-

(1) territorial, where[ ] jurisdiction is based on the place where the offense is committed; (2) national, where[ ] jurisdiction is based on the nationality of the offender; (3) protective, where[ ] jurisdiction is based on whether the national interest is injured; (4) universal, which amounts to physical custody of the offender; and (5) passive personality, where[ ] jurisdiction is based or the nationality or national character of the victim. [*United States v Smith*, 680 F2d 255, 257 (CA 1, 1982).]

At common law, criminal jurisdiction was based primarily on the territorial principle. Under this view, because "each crime has only one situs (or locus) . . . only the place of the situs has jurisdiction."[11] Thus, if the situs is within the physical borders of a state, the state may subject the perpetrator to prosecution.[12]

---

sonality); George, *Extraterritorial application of penal legislation,* 64 Mich L R 609, 613-614 (1966) (recognizing six bases: territorial, floating territory, protected interest, nationality of the offender, nationality of the victim, and universality); Perkins, *The territorial principle in criminal law,* 22 Hastings L J 1155, 1155 and n 1 (1971) (recognizing four bases: territorial, Roman, injured forum, cosmopolitan); Rotenberg, n 8 *supra* at 767, n 17, citing *Jurisdiction with respect to crime,* 29 Am J Int'l L Supp 435, 445 (1935) (recognizing five bases: territorial, national, protective, universal, and passive personality); and comment, *Jurisdiction over interstate felony murder,* 50 U Chi L R 1431, 1433-1439 (1983) (recognizing three bases: common law or territorial, significant activity, and integral relation).

[11] LaFave & Scott, Criminal Law (2d ed), § 2.9(a), p 129.

[12] However, restricting jurisdiction to that based exclusively on the territorial principle, leads to fictions intended to fix the location of a crime for jurisdictional purposes. Berge, *Criminal jurisdiction and the territorial principle,* 30 Mich L R 238, 243-244 (1931). For example, courts have created the doctrine of constructive presence in order to allow a state to punish an offender not located within the state when the offender set in motion the events which culminated in a harm in the prosecuting state. *Id.* The classic formulation of the doctrine of constructive presence is found in *Simpson v State,* 92 Ga 41; 17 SE 984 (1893). In affirming the conviction of a defendant who had been standing in the State of South Carolina at the time he shot at a person in Georgia, the Georgia Supreme Court stated:

Of course, the presence of the accused within this State is essential to make his act one which is done in this State; but

As an aid in pinpointing the situs of the crime, courts divided the territorial principle into "objective" and "subjective" bases.[13] Under the objective territorial principle, the situs "include[s] the state whose rights have been assailed, including the state's 'political integrity' and the 'life, safety, and property of its subjects.' "[14] Thus, where the "life, safety and property" of a state's citizens are endangered, the Legislature may proscribe conduct that occurs outside the state's physical borders.

Conversely, under the subjective territorial principle, the situs of the crime for legislative jurisdictional purposes is "the state in which the offender is located at the time the crime is committed . . . [because] it is that state to which the offender looks in governing his conduct."[15] Thus, where an actor's conduct produces detrimental effects in

the presence need not be actual. It may be constructive. . . . So, if a man in the State of South Carolina criminally fires a ball into the State of Georgia, the law regards him as accompanying the ball, and as being represented by it, up to the point where it strikes. . . . [T]he act of the accused did take effect in this State. He started across the river with his leaden messenger, and was operating it up to the moment when it ceased to move, and was therefore, in a legal sense, after the ball crossed the State line up to the moment it stopped, in Georgia. [*Id.* at 43, 46; quoted in Berge, *supra* at 243-244.]

Justice Holmes, dissenting in *Hyde v United States,* 225 US 347, 384; 32 S Ct 793; 56 L Ed 1114 (1912), cautioned against the circular reasoning resulting from the constructive presence fiction. He stated:

To speak of constructive presence is to use the language of fiction, and so to hinder precise analysis. When a man is said to be constructively present where the consequences of an act done elsewhere are felt, it is meant that for some special purpose he will be treated as he would have been treated if he had been present, although he was not. [*Id.* at 386; quoted in Berge, *supra* at 244.]

[13] Rotenberg, n 8 *supra* at 769.

[14] *Id.,* quoting Wharton, *Extra-territorial crime,* 4 Southern L R 676, 699-700 (1878).

[15] *Id.,* citing Stimson, Conflict of Criminal Laws (1936).

another state, the state where the actor was physically located at the time of his conduct would be able to proscribe the conduct. The principles are not mutually exclusive. Indeed, more than one principle may be applicable to a given set of facts.[16]

As the majority acknowledges, we have recognized exceptions to the general rule against extraterritorial application of state statutes "as populations and technology progressed and travel between countries and among the states increased to an everyday occurrence . . . ."[17] We have approved the objective territorial principle of criminal jurisdiction,[18] and have recognized that Michigan may give extraterritorial effect to its criminal laws where the acts committed outside the state that sought to punish them were intended to have a detrimental effect in our state. In *Deur v Newaygo Sheriff*, 420 Mich 440; 362 NW2d 698 (1984), the plaintiff, a Michigan resident who owned a tractor-trailer rig that lost braking control and fatally injured three persons in Maryland, was indicted by a Maryland grand jury for manslaughter by motor vehicle. The plaintiff was arrested in Michigan, but resisted extradition to Maryland. While the indictment alleged that the plaintiff

[16] *Id.* at 768. See also *United States v King*, 552 F2d 833, 851 (CA 9, 1976), cert den 430 US 966 (1977) ("[C]ourts have recognized that the territorial concept of jurisdiction is neither exclusive nor a full and accurate characterization of the powers of states to exercise jurisdiction beyond the confines of their geographical boundaries"); *Wheat v State*, 734 P2d 1007, 1008 (Alas App, 1987) ("The issue is now well-settled in the modern view that states may rely, without constitutional impediment, on a number of non-territorial grounds as a basis for asserting criminal jurisdiction over acts occurring outside their borders"), citing Perkins & Boyce, Criminal Law (3d ed), pp 38-45; 1 Torcia, Wharton, Criminal Law (12th ed), § 14.

[17] *Sexton v Ryder Truck Rental, Inc*, 413 Mich 406, 434; 320 NW2d 843 (1982).

[18] *Deur v Newaygo Sheriff*, 420 Mich 440, 446-447; 362 NW2d 698 (1984).

"had 'intentionally and knowingly' adopted and enforced a policy of poor maintenance which contributed to the accident[,]"[19] the Maryland statute proscribed grossly negligent operation, driving, or control of a motor vehicle. In short, Maryland sought "to give extraterritorial effect to a penal statute seeking to regulate *unintentional* conduct."[20] We noted that the United States Supreme Court had addressed the issue in *Strassheim v Daily,* 221 US 280; 31 S Ct 558; 55 L Ed 735 (1911):

> In *Strassheim,* the accused had been indicted in Michigan for bribery and also for obtaining money from the state by false pretenses. The accused, Daily, did not act in Michigan relating to the charged crimes. In reversing an order on habeas corpus discharging Daily, Justice Holmes, writing for the Court, stated, pp 284-285:
>
> "If a jury should believe the evidence and find that Daily did the acts that led Armstrong to betray his trust, deceived the Board of Control, and induced by fraud the payment by the State, the usage of the civilized world would warrant Michigan in punishing him, although he never had set foot in the State until *after* the fraud was complete. *Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a State in punishing the cause of the harm as if he had been present at the effect, if the State should succeed in getting him within its power."* (Emphasis added.)[21]

---

[19] *Id.* at 443.

[20] *Id.* at 446. (Emphasis added.)

[21] *Id.* at 446-447. The most recent application of the doctrine in the Court of Appeals resulted in allowing Michigan to bring criminal charges pursuant to MCL 750.350a; MSA 28.582(1), against the non-custodial father of a child for retaining that child in Colorado in violation of the Michigan custody order. *People v Harvey,* 174 Mich App 58; 435 NW2d 456 (1989). On the basis of *Deur* and *Strassheim,*

Because Michigan's nonfugitive extradition stat-ute[22] requires an act in Michigan that "intention-ally result[s] in a crime" in the state requesting extradition, and because the Maryland statute allowed prosecution for grossly negligent conduct, the plaintiff was entitled to habeas corpus relief.

Because we have recognized the objective territo-rial principle of criminal jurisdiction in a different context, we agree with the majority that the Legis-lature may proscribe conduct that occurs outside our physical borders that is intended to produce, and actually produces, a detrimental effect in Michigan.

IV

The conclusion that the Legislature has the authority to enact a statute with extraterritorial effect does not end the inquiry. The statute may only be enforced against conduct that occurs out of state if the Legislature's intent to give the statute extraterritorial effect is clear.[23] The statutes in question are silent with regard to their extraterri-torial application. We therefore look to their pur-pose and subject matter to determine the relevant legislative intent.

The United States Supreme Court described the appropriate analysis as follows:

> We have in this case a question of statutory

the Court of Appeals held that the father's failure to return his child to her mother

> should be considered a crime committed within the State of Michigan. . . . The detrimental effects of defendant's inten-tional retention of the girl in violation of the Michigan court's custody order occurred here, in Michigan, since it was the authority of a Michigan court that was thwarted and it was the custodial right of a Michigan resident that was infringed upon. [*Id.* at 61.]

[22] MCL 780.3a; MSA 28.1285(3-1/2).
[23] *Sexton,* n 17 *supra* at 434, 435.

construction. The necessary locus, when not spe-
cially defined, depends upon the purpose of Con-
gress as evinced by the description and nature of
the crime and upon the territorial limitations
upon the power and jurisdiction of a government
to punish crime under the law of nations. Crimes
against private individuals or their property, like
assaults, murder, burglary, larceny, robbery, ar-
son, embezzlement and frauds of all kinds, which
affect the peace and good order of the community,
must of course be committed within the territorial
jurisdiction of the government where it may prop-
erly exercise it. If punishment of them is to be
extended to include those committed outside of the
strict territorial jurisdiction, it is natural for Con-
gress to say so in the statute, and failure to do so
will negative the purpose of Congress in this
regard. . . .

But the same rule of interpretation should not
be applied to criminal statutes which are, as a
class, not logically dependent on their locality for
the Government's jurisdiction, but are enacted
because of the right of the Government to defend
itself against obstruction, or fraud wherever perpe-
trated, especially if committed by its own citizens,
officers or agents. Some such offenses can only be
committed within the territorial jurisdiction of the
Government because of the local acts required to
constitute them. Others are such that to limit
their locus to the strictly territorial jurisdiction
would be greatly to curtail the scope and useful-
ness of the statute and leave open a large immu-
nity for frauds as easily committed by citizens on
the high seas and in foreign countries as at home.
In such cases, Congress has not thought it neces-
sary to make specific provision in the law that the
locus shall include the high seas and foreign coun-
tries, but allows it to be inferred from the nature
of the offense. [*United States v Bowman*, 260 US
94, 97-98; 43 S Ct 39; 67 L Ed 149 (1922).]

Construction of criminal statutes to determine
extraterritorial application has not been limited to

construction of statutes proscribing fraud or obstruction. For example, the federal courts have applied this method in cases involving conspiracy and illegal possession with intent to distribute narcotics,[24] and conspiracy to kill a member of Congress and aiding and abetting the killing of a member of Congress.[25] However, this Court has held that the Legislature's power to do so is limited to intentional acts that are intended to have, and that actually do have, a detrimental effect within the state. When detrimental effects are intended and actually occur, the state may punish the actor as if he had been present in the state at the time the acts were performed.[26]

We conclude that the nature of both conspiracy to commit an offense and aiding and abetting in the commission of an offense is such that inclusion of language making them specifically applicable to conduct that occurred outside the state's borders is unnecessary. Moreover, neither conspiracy nor aiding and abetting logically require that the conduct that constitutes the agreement or the aid be committed within Michigan's physical borders.

A

The textbook definition of conspiracy is a mutual agreement or understanding, express or implied,

[24] 21 USC 846; 21 USC 841(a)(1); *United States v Baker,* 609 F2d 134 (CA 5, 1980).

[25] 18 USC 351(a); *United States v Layton,* 855 F2d 1388 (CA 9, 1988), cert den 489 US 1046 (1989). In *Layton,* the defendant, a member of the People's Temple, was charged in connection with the death of Congressman Leo Ryan at the Port Kaituma airstrip in the Republic of Guyana. The defendant argued that the court lacked subject matter jurisdiction because the alleged acts occurred outside the United States. The court disagreed and held that the district court had "properly exercised subject matter jurisdiction over each count in the indictment." 855 F2d 1394.

[26] The majority's statement that defendant must have a specific intent to act is simply a misreading of *Deur, supra.*

between two or more persons to commit a criminal
act or to accomplish a legal act by unlawful
means.

An overt act in furtherance of the conspiracy is
unnecessary[27] because the crime is complete when
the agreement is reached. However, to say that
the crime is complete when the agreement is
reached does not mean that the agreement must
occur within Michigan. The crime of conspiracy
continues while the parties are engaged in the
unlawful enterprise. In other words, it exists until
arrest, abandonment, or success.[28]

The crime of conspiracy requires a dual intent:
an "intent to combine with others, and [an] intent
to accomplish the illegal objective."[29] Because in-
tent may be inferred from evidence of the circum-
stances, acts, and conduct of the parties, " '[d]irect
proof of an agreement is not required, nor is it
necessary that a formal agreement be proven.' "[30]
Furthermore, while "knowledge is the foundation
of intent," and mere knowledge of a conspiracy or
its illegal objective, without more, is not enough to
prove intent,[31] we may examine the defendant's
conduct to determine whether the defendant pro-

[27] The federal government and some other states require that an
overt act in furtherance of the conspiracy be performed within their
physical borders in order to confer jurisdiction. See, e.g., *United
States v Winter,* 509 F2d 975, 982 (CA 5, 1975). However, if we were
to require that an overt act occurred in Michigan before Michigan
could punish the conspiracy designed to have a detrimental effect in
Michigan, we "would have the anomalous requirement that more be
shown for jurisdiction than is necessary for conviction of the crime."
*United States v Williams,* 589 F2d 210, 213 (CA 5, 1979).

[28] See LaFave & Scott, n 11 *supra,* § 6.5(e), p 555.

[29] *People v Carter,* 415 Mich 558, 568; 330 NW2d 314 (1982).

[30] *Id.,* quoting *People v Atley,* 392 Mich 298, 311; 220 NW2d 465
(1974).

[31] *Direct Sales Co v United States,* 319 US 703, 711-712; 63 S Ct
1265; 87 L Ed 1674 (1943); *United States v Falcone,* 109 F2d 579 (CA
2, 1940), aff 'd 311 US 205; 61 S Ct 204; 85 L Ed 128 (1940); *Atley,* n
30 *supra* at 310.

The majority cites *Direct Sales* and *Falcone* for the proposition that

vided "informed and interested coöperation, stimulation, [or] instigation."[32]

The agreement to commit a criminal act that is the gist of the offense of conspiracy is punished because of the "special danger to society presented by group as opposed to individual activity."[33]

> "Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish." [*People v Carter*, 415 Mich 558, 570; 330 NW2d 314 (1982),

" ' "the evidence of knowledge must be clear, not equivocal" ' " and that " ' the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally.' " *Ante*, p 485. What the majority, itself, fails to acknowledge is that in *Falcone*, the government argued that knowledge of the conspiracy to operate illicit stills and informed coöperation in it could be inferred from sales of goods not illegal in themselves—sugar, yeast and cans—to known distillers of alcoholic beverages during prohibition. The court in *Falcone* disagreed. The suppliers of the unrestricted goods could not be held to be part of the conspiracy without knowledge of the conspiracy to operate the illicit stills and active participation in that goal.

Later, in *Direct Sales,* the Court noted that the quantity of proof required to show knowledge of the buyer's unlawful use of a product was different where the product is inherently harmful. Thus, the Court permitted an inference of knowledge of the misuse of a prescription mail-order narcotic to be drawn from the mail-order company's quantity sales and sales tactics to a physician who was illegally dispensing the narcotics. In this respect the Court noted that "[a]ll articles of commerce may be put to illegal ends. But all do not have inherently the same susceptibility to harmful and illegal use. *Nor, by the same token, do all embody the same capacity, from their very nature, for giving the seller notice the buyer will use them unlawfully." Id.* at 710. (Emphasis added.)

Both further possession of a kilogram of cocaine and further distribution of a kilogram of cocaine are unlawful. Thus, unlike sales of a prescription narcotic, the nature of cocaine and the quantity allegedly sold, allow the inference that Blume knew of Hoyt's intended unlawful use.

[32] *Direct Sales Co,* n 31 *supra* at 713.

[33] *Carter,* n 29 *supra* at 569-570.

quoting *Callanan v United States,* 364 US 587,
593-594; 81 S Ct 321; 5 L Ed 2d 312 (1961).]

Thus, the nature of the offense is clearly not
situs based. The agreement to pursue an illegal
goal need not occur in Michigan. Moreover, the
increased danger to society posed by group associa-
tion, and its continuing quality, compel the conclu-
sion that the Legislature intended the conspiracy
statute to be applied to an agreement that was
reached in Florida with intended consequences in
Michigan. A contrary result ascribes an intent to
the Legislature to abandon protection of Michigan
citizens and "leave open a large immunity for
[conspiracies] as easily committed by citizens" in
other states as in Michigan.[34]

B

The same reasoning applies to the substantive
charge brought under the aiding and abetting
theory. The aiding and abetting theory is used to
connect one person to the illegal action of an-
other.[35] It seeks to proscribe "all words or deeds
which may support, encourage or incite the com-
mission of a crime."[36] Like the agreement in a
conspiracy, the aid or encouragement need not
logically occur in Michigan, especially where the
crime that is aided or encouraged will be commit-
ted in Michigan. Thus, the nature and purpose of
the statute proscribing aiding and abetting a crime
support our conclusion that the Legislature in-
tended it to apply to aid or encouragement given
outside our physical borders.

Moreover, pursuant to the statute, one who aids
and abets is to be treated in all respects as if he

---

[34] *United States v Bowman,* 260 US 94, 98; 43 S Ct 39; 67 L Ed 149
(1922).

[35] *Carter,* n 29 *supra* at 575.

[36] *People v Palmer,* 392 Mich 370, 378; 220 NW2d 393 (1974).

had directly committed the substantive crime.[37] To say that the state may prosecute Hoyt for the substantive offense, but may not prosecute Blume for that offense under an aiding and abetting theory, would be, in effect, to treat Blume as if he had not directly committed the crime. Such an anomalous result is not required by the statute.

v

We reiterated in *Deur*[38] that an intentional act intended to cause and causing harmful consequences in the forum state is within the reach of the state's authority. As *Deur* indicates, the threshold question for assertion of the state's jurisdiction is whether there is a showing sufficient to permit the court to conclude that the defendant intended to produce a detrimental effect in the forum state. This question is separate from whether the elements of the crime can be made out at the preliminary examination.

Defendant's motion to quash the complaint and warrant challenges the magistrate's conclusion regarding the jurisdiction of the court to issue the warrant and ultimately try him for the offenses charged. As noted, a Michigan court has jurisdiction to try a defendant charged with acts that

[37] *Carter,* n 29 *supra* at 576.

[38] The objective territorial principle embraced in *Deur* "has been asserted successfully where there was proof that defendant's actions either produced some effect within the [forum seeking to prosecute], or even if the defendant never performed any act within the [forum], that he was part of a conspiracy in which some coconspirator's activities took place within [the forum]." *Baker,* n 24 *supra* at 138. In other words, if the conspiracy is designed to result in a crime in the forum, and if there is proof of an overt act committed in the forum by at least one coconspirator, the forum will have jurisdiction over the conspiracy. *Winter,* n 27 *supra* at 982. "Under conspiracy doctrine, the forum state has jurisdiction over all conspirators involved in a conspiracy and all criminal acts committed in furtherance of it if any overt act is committed within its bounds by any of the conspirators." George, n 10 *supra* at 623.

occurred outside the geographical boundaries of the state where the defendant intended to cause, and actually caused, a detrimental effect in Michigan. Thus, on review rather than weigh the evidence, we must determine whether there was any evidence to support the issuing magistrate's conclusion that probable cause existed to believe that the magistrate possessed jurisdiction to act. In other words, was any evidence presented to show that the defendant intended to cause a detrimental effect in Michigan and was any evidence presented to show that a detrimental effect did, in fact, occur in Michigan.[39] We believe there was.

By contrast with the jurisdictional facts in *Deur,* in the instant case, as in *Strassheim,* the record supports the circuit court's conclusion that defendant committed an intentional act, with an intent to produce detrimental effects in Michigan, which did produce such detrimental effects.[40] The investigating officer testified that defendant knew that Hoyt lived in and intended to return to Michigan. At the very least, defendant's knowledge, coupled with his alleged delivery of cocaine, supports an inference that the defendant intended that Hoyt

[39] The majority would have the prosecutor prove beyond a reasonable doubt that this intent existed and would have the magistrate act as the trier of fact where intent is disputed. As noted, disputed questions of fact regarding the defendant's intent are for a jury to resolve.

[40] But see *People v Puig,* 85 Misc 2d 228, 233; 378 NYS2d 925 (1976), where the court held that the possible sale of narcotics in New York from an alleged transfer of cocaine that occurred in New Jersey did not give the New York court jurisdiction over the transfer. It reasoned that, under Criminal Procedure 20.20(2)(b), jurisdiction was proper if " 'the statute defining the offense is designed to prevent the occurrence of a particular effect in this state and the conduct constituting the offense committed was performed with intent that it would have such effect herein.' " " '[P]articular effect' " means that the consequences of the conduct " 'have a materially harmful impact upon the governmental processes or community welfare of a particular jurisdiction . . . .' " *Id.* Possible sales in New York did not satisfy the requirement of a particular effect.

possess cocaine in Michigan. Because it is unlawful to possess cocaine in Michigan, and because criminal activity is detrimental to the citizens of Michigan, it can fairly be said that the defendant intended a detrimental result in Michigan.

However, as defendant's brief acknowledges, the officer further testified that defendant knew that it was possible that Hoyt would split the cocaine with another person upon his return to Michigan. This additional knowledge supports the inference that the intended detrimental effect was distribution of the cocaine in Michigan by Hoyt. Either way, an intended detrimental effect may be inferred from the evidence presented. Defendant's conduct allows us to conclude, for the purposes of asserting jurisdiction, that he intended to produce detrimental effects in Michigan. Moreover, officers found cocaine at Hoyt's apartment and at his business. Hoyt told officers that he had purchased the cocaine from Blume. Thus, evidence was presented to show that Blume's conduct resulted in Hoyt's possession of cocaine in Michigan, a detrimental effect. Therefore, evidence to support the magistrate's determination of jurisdiction to act in the case existed, and it was error for the district court to quash the complaint and warrant.

Whether the defendant introduced evidence for the purpose of negating the existence of the required intent is not dispositive of the motion to quash. Thus, the majority's observation that it does not appear that defendant knew or intended that Hoyt was going to "sell" the cocaine in Michigan is a non sequitur. To determine the magistrate's jurisdiction to act, it is not required that the defendant specifically intended that the drugs be "sold" in Michigan. All that is required is that the defendant perform an intentional act with knowledge of its harmful consequences, in this

case possession of drugs in Michigan. Therefore, we would hold that under the facts as found by the district court,[41] there was subject matter jurisdiction to hear and decide the case.

.VI

In sum, we would hold that the Legislature possesses the power to proscribe conduct that occurs outside the state where that conduct is intended to produce and actually produces detrimental effects in the State of Michigan. Because statutes proscribing conspiracy and statutes proscribing aiding or encouraging the commission of a crime have as their purpose prevention of dangerous concert of action, and because the nature of each statute is such that the conduct that constitutes a violation of the statute need not logically occur within the physical borders of the State of Michigan, we would hold that the Legislature intended to allow application of the statute to acts that occurred outside the state.[42] We would also

[41] This Court has the benefit of a record created on the jurisdictional issue. The United States Supreme Court in *Strassheim, supra,* looked only to the facts alleged in the indictment for obtaining money by false pretenses. It assumed that if a jury believed the evidence, the defendant could be tried in Michigan, because the facts as alleged in the indictment showed that the defendant intended to produce, and actually produced, a detrimental effect in the state seeking to prosecute.

[42] Defendant argues that before reversing the decision of the district court, the circuit court must first have found that the district court abused its discretion in its findings of fact. We agree with the Court of Appeals: "[T]he circuit court did not dispute the district court's findings of fact, but accepted them as valid. The circuit court decision was exclusively based on the finding that the district court erred as a matter of law on the jurisdiction issue." Slip op, p 2.

Defendant also argues that it was error for the circuit court to find that the elements of a conspiracy were established. Again we agree with the Court of Appeals: "[T]he circuit court hearing was not a preliminary examination but was, as defense counsel conceded, held only to address the issue of whether the district court erred in determining the legal question regarding jurisdiction." *Id.*

hold that the evidence supports the magistrate's determination of jurisdiction to act in this case.

We would affirm the decision of the Court of Appeals, reinstate the charges, and remand the case to the district court.

RILEY and MALLETT, JJ., concurred with BOYLE, J.