*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JOSEPH CARLO GIGLIOTTI,

        Defendant-Appellant.

UNPUBLISHED
June 15, 2023

No. 359415
St. Clair Circuit Court
LC No. 20-001091-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

BRANDON LEE WILLIAMS,

        Defendant-Appellant.

No. 359429
St. Clair Circuit Court
LC No. 20-001092-FC

Before: REDFORD, P.J., and O'BRIEN and FEENEY, JJ.

PER CURIAM.

These consolidated appeals arise from the joint jury trial of defendants, Joseph Carlo Gigliotti and Brandon Lee Williams, and their resulting convictions. Gigliotti and Williams were convicted of armed robbery, MCL 750.529(1); conspiracy to commit armed robbery, MCL 750.529(1); MCL 750.157a; and assault with intent to commit great bodily harm less than murder (AWIGBH), MCL 750.84(1)(a).[1] In Docket No. 359415, Gigliotti was sentenced to 18 to 30 years' imprisonment for the armed robbery conviction; 18 to 30 years' imprisonment for the conspiracy to commit armed robbery conviction; and 5 to 10 years' imprisonment for the AWIGBH

---

[1] Williams was also charged with possession of a pneumatic gun during the commission of a felony. MCL 750.227b(2). He was acquitted of that charge.

-1-

conviction. In Docket No. 359429, Williams was sentenced, as a second-offense habitual offender, MCL 769.10, to 22 to 40 years' imprisonment for the armed robbery conviction; 22 to 40 years' imprisonment for the conspiracy to commit armed robbery conviction; and 7 to 15 years' imprisonment for the AWIGBH conviction. We affirm in both dockets, but remand for the ministerial task of amending the judgments of sentence.

## I. BACKGROUND

This matter arises from the June 24, 2020 armed robbery and assault of the victim, who agreed to sell Joseph Smith ecstasy. Smith, who arranged to rob the victim with Williams via Facebook messenger, traveled to Port Huron Township in a red Cadillac with Jovonte Thurman, Alexandra Dillon, Williams, and Gigliotti. Williams had a knife, and Gigliotti had a pellet gun. Everyone in the car agreed that, in order to rob the victim, Gigliotti would hide outside the car and jump the victim after he approached the car. Money was collected to show the victim. Smith arranged to meet the victim near the corner of Dixon Street and 25th Street. This was close to the home of Sarah Thomas and Roger Torvik, where the victim was located. Upon nearing the location, Gigliotti exited the Cadillac and hid behind a nearby trailer.

At about 4:00 a.m., the victim approached the red Cadillac, which contained Smith, Thurman, Williams, and Dillon. Smith and the victim discussed the drugs. After Thurman sent Gigliotti a thumbs up emoji, Gigliotti either pulled the victim out of the Cadillac or approached him from behind while he was standing outside the Cadillac. A struggle ensued, and Williams and Thurman exited the Cadillac to assist Gigliotti. When they returned, Williams had blood on his clothing, Gigliotti had an injury to one of his hands, and Thurman had been stabbed in the chest. They fled the scene and stopped at a nearby gas station. There, Thurman (who was driving) switched seats with Gigliotti, and someone threw the pellet gun into the yard of a nearby home. It was later recovered by members of law enforcement.

The victim, who had been stabbed multiple times and shot with the pellet gun, yelled for help. Thomas and Torvik assisted the victim, and 911 was called. When law enforcement arrived, the victim described the red Cadillac. The victim was transported to the hospital, where he remained for five days. The red Cadillac was located near the scene of the crimes, and a traffic stop was initiated. Smith, who had a warrant for his arrest, attempted to flee but was apprehended. The others stayed with the Cadillac—Gigliotti, Williams, and Dillon were taken into custody, and Thurman was pronounced dead. A "folding knife," which had "blood all over it," and a box cutter were located in the Cadillac. Another box cutter was located on the ground near the traffic stop, and "a large knife" was located on Williams' person. A multitude of evidence was collected, and cell phones were seized and submitted for analysis. Limited evidence, namely the weapons that were collected, were submitted for DNA analysis.

Gigliotti and Williams were charged with (1) armed robbery; (2) conspiracy to commit armed robbery; (3) possession of a pneumatic gun during the commission of a felony; and (4) AWIGBH. The victim testified at the preliminary examination and denied that he had drugs on his person at the time of the crimes, saying that he was a "the middle man" in relation to the drug transaction. According to the victim, Gigliotti approached him from behind and stabbed him in the back and head. He testified that Smith and a man matching Thurman's description participated in the attack. The victim was unable to identify Williams as one of his attackers, and the victim

denied that he had a knife on his person during the attack. During an extensive cross-examination by counsel for Gigliotti and Williams, the victim acknowledged that he told Detective Kelsey Wade that he saw a knife during the attack and picked it up. The victim also told Detective Wade that he was "swinging it around towards the individuals who were within a[n] arm's length range of" him. The victim testified that he consumed marijuana in the hours before the crimes were committed, and he acknowledged that he had significant memory issues surrounding the crimes. Following the preliminary examination, Gigliotti and Williams were bound over for trial.

After the preliminary examination but before trial, Torvik came forward and provided additional details about the night of the robbery. Torvik reported that in the early morning hours of June 24, 2020, he, Thomas, and the victim "smoked some weed and did some meth[amphetamine] and some other stuff," including consuming alcohol and ecstasy. Torvik also reported that the victim had a knife and methamphetamine on his person when he left the house on June 24, 2020. Torvik reported that the knife, which folded, was "black [and] kind of curved." Torvik also reported that the victim handed Torvik "a gram, a gram and a half" of methamphetamine and "[a]bout $200" in cash after the victim was stabbed. The bills were "bloody." Additionally, after the preliminary examination, DNA test results were obtained. They reflected that Thurman and the victim likely contributed to DNA found on a knife blade and handle that was seized by law enforcement. There was also "strong support" that the victim contributed to DNA found on the pellet gun's barrel or "hammer."

In September 2021, trial commenced and took place over seven days. Dillon and Smith, who had been charged with crimes in relation to this case, received plea deals. They testified on behalf of the prosecution, but acknowledged that they had memory issues. The victim, who was in jail at the time, refused to testify at trial. The trial court declared him unavailable and admitted his preliminary examination testimony into evidence. MRE 404(b) evidence was also admitted, over Gigliotti's objection, that Gigliotti and Williams had been discussing "hitting licks," "jugging" people, selling ecstasy, and using ecstasy and other drugs in the weeks leading up to the crimes at issue in this case. References to weapons were also made, and photographs of weapons, including brass knuckles and guns, were exchanged between them. The communications occurred via Facebook messenger. Gigliotti and Williams were ultimately convicted of armed robbery, conspiracy to commit armed robbery, and AWIGBH.

Defendants were sentenced as described above. These appeals followed. This Court consolidated the appeals "to advance the efficient administration of the appellate process." *People v Gigliotti*, unpublished order of the Court of Appeals, entered January 31, 2023 (Docket Nos. 359415 and 359429).

## II. DEFENDANT GIGLIOTTI (DOCKET NO. 359415)

### A. ADMISSION OF THE VICTIM'S PRELIMINARY EXAMINATION TESTIMONY INTO EVIDENCE

Gigliotti argues the trial court abused its discretion when it determined that the victim was unavailable under MRE 804(a)(2), and when it allowed the prosecution to admit the victim's preliminary examination testimony under MRE 804(b)(1). Gigliotti also argues that the trial court

violated his federal and state constitutional rights to confrontation when it allowed the victim's preliminary examination to be admitted. We disagree with both arguments.[2]

## 1. STANDARDS OF REVIEW

A trial court's decision to admit evidence is reviewed for an abuse of discretion. *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Warner*, 339 Mich App 125, 133; 981 NW2d 733 (2021). However, preliminary questions about a trial court's interpretation and application of court rules are reviewed de novo. *People v Kimble*, 470 Mich 305, 308-309; 684 NW2d 669 (2004). Questions of constitutional law are likewise reviewed de novo. *Warner*, 339 Mich App at 157.

## 2. ANALYSIS

Gigliotti argues that the trial court erred when it concluded that the victim was unavailable for purposes of MRE 804(b)(1), which is an exception to the hearsay rule. Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay is inadmissible unless an exception applies. MRE 802. One such exception is MRE 804(b)(1), which provides that, if a witness is unavailable, the witness's "[t]estimony given as a witness at another hearing of the same or a different proceeding" is not excluded by the hearsay rule "if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

Whether a declarant is unavailable is governed by MRE 804(a). The trial court found that the victim was unavailable under MRE 804(a)(2), which states that a witness is unavailable if the witness "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so[.]" In our opinion, the trial court properly applied MRE 804(a)(2) to the facts of this case to conclude that the victim was unavailable under the court rules.

The prosecutor subpoenaed the victim to testify at trial. Before jury selection on September 14, 2021, the prosecutor informed the trial court and counsel for Williams and Gigliotti that the victim was unwilling to testify. Two days later, the prosecutor noted that the victim "was not willing to come over, [or] put any clothes on . . . ." The prosecutor further noted that they "had a follow-up" that day, and the victim again "refus[ed] to come over." The next day, September 17, 2021, an undersheriff from the St. Clair County Sheriff's Department informed the trial court that they had spoken to the victim that morning, and expressed "some concerns of him not wanting to come to the courtroom to testify." The victim was "a little upset," noted that he had told "other people" "several times" "that he is not going over to court to testify," and stated that he would

---

[2] The prosecution imply that this Court should not consider this issue, or the next four issues raised by Gigliotti, because Gigliotti should have raised them before the trial court in a motion for a new trial. We are unaware of any authority supporting such an assertion, however. More importantly, the prosecution failed to cite any authority supporting its assertion. Accordingly, we consider the argument abandoned. See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998).

"refuse any type of transportation" if jail personnel tried "to take him" to court. According to the undersheriff, the victim stated: "I'm not going, you can't make me go and I refuse transportation." After listening to the undersheriff, the trial court noted that it could threaten to hold the victim in contempt, but believed that would be "a somewhat [empty] threat in [the victim's] current situation." The court then questioned the undersheriff, who informed the trial court that the jail did not have a policy concerning what to do in situations where an inmate refuses transport to court, noting that it was a novel situation. The undersheriff believed that "it would be a struggle to get" the victim to court, as the victim would "struggle" and "be defiant," which could lead to issues on "the liability front." After it finished questioning the undersheriff, the trial court concluded that the victim was "a stubborn individual" who did not "want to testify" and was "unwilling to honor the terms of his subpoena." The court then found that "if forceful measures were taken it would be nothing but an escalating problem between the transport officers and [the victim] that could potentially lead to all kinds of other problems." The court stated that it was "not willing to take that risk," and accordingly found that the victim was unavailable for purposes of MRE 804(a)(2).

On the basis of the foregoing, the trial court's conclusion that the victim was unavailable under MRE 804(a)(2) because he "persist[ed] in refusing to testify . . . despite an order of the court to do so" is plainly supported by the record. Gigliotti contends that MRE 804(a)(2) is inapplicable because the victim "made himself unavailable," but there is nothing in the language of MRE 804(a)(2) to support Gigliotti's contention that the victim's reason for refusing to testify is relevant. MRE 804(a)(2) simply requires that the witness "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so[.]" The victim was under a court order to testify, but persisted in refusing to do so. Accordingly, we conclude that the trial court properly applied MRE 804(a)(2) to the facts of this case.

If a declarant is unavailable, "MRE 804(b)(1) permits the trial court to admit into evidence [his] former testimony from the preliminary examination [if] defense counsel had an opportunity and similar motivation to develop [his] testimony on cross-examination." See *People v Adams*, 233 Mich App 652, 659; 592 NW2d 794 (1999).

Gigliotti argues that the victim's preliminary-examination testimony should not have been admitted under MRE 804(b)(1) because he did not have a "similar motive to develop the [victim's] testimony" at trial that he did at the preliminary examination. See *Adams*, 233 Mich App at 659. In determining whether a party had a similar motive to examine a witness at a prior proceeding, this Court considers the following non-exhaustive list of factors:

> (1) whether the party opposing the testimony had at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue; (2) the nature of the two proceedings—both what is at stake and the applicable burden of proof; and (3) whether the party opposing the testimony in fact undertook to cross-examine the witness (both the employed and available but forgone opportunities). [*People v Farquharson*, 274 Mich App 268, 278; 731 NW2d 797 (2007) (citation and quotation marks omitted).]

The prosecutor's purpose in presenting the victim's testimony at the preliminary examination was the same as at trial: to show Gigliotti committed the charged crimes. Therefore,

Gigliotti had an "interest of substantially similar intensity" in proving or disproving the victim's testimony at the preliminary examination, just as he did at trial. While the prosecution's burden of proof at the preliminary examination was lower than its burden at trial, Gigliotti had a similar motive to cross-examine the victim in both proceedings—Gigliotti was motivated to show that he did not commit the charged crimes. Because the same issues were at stake in both the preliminary examination and the trial, Gigliotti had a substantially similar interest in those issues relative to the victim's testimony in each of those proceedings. See *id*. See also *Adams*, 233 Mich App at 659 ("In light of the complainant's unavailability, MRE 804(b)(1) permits the trial court to admit into evidence her former testimony from the preliminary examination because defense counsel had an opportunity and similar motivation to develop her testimony on cross-examination.").

Gigliotti alternatively argues that he did not have a "full and complete opportunity to cross-examine" the victim at the preliminary examination because certain impeachment evidence was not available to him at that time.[3] We are unpersuaded by Gigliotti's argument in this respect because his counsel vigorously cross-examined the victim at the preliminary examination and, in doing so, cast serious doubt on the victim's credibility. At the preliminary examination, Gigliotti's counsel elicited testimony that the victim did drugs in the hours before the crimes, which the victim acknowledged impaired his memory. Gigliotti's counsel also elicited testimony from the victim that it was dark outside when the crimes occurred and asked extensive questions as to how he knew Gigliotti attacked him. The victim often testified that he was unable to remember certain things and did not know certain things. Additionally, counsel highlighted that the victim's testimony at the preliminary examination contradicted previous statements he made to members of law enforcement. Importantly, when confronted about his lack of memory and the inconsistencies in his statements, the victim acknowledged that he did not "remember a lot" because he was "suffering from long-term and short-term memory" loss after "being stabbed in the head eight times," and that he did not know if he was remembering the incident or "was dreaming about it" in the hospital. Thus, the victim was repeatedly impeached during the preliminary examination in a way that would have alerted the jury to numerous and serious inconsistencies in the victim's testimony, such that less serious impeachment issues—like Torvik's testimony about what kind of drugs the victim consumed, and whether the victim gave Torvik money after he was stabbed—would not have seriously tested the victim's credibility. Stated differently, Gigliotti had a fair opportunity to cross-examine the victim at the time of the preliminary examination, despite not having access to every piece of potential impeachment evidence that was eventually admitted at trial.

For these reasons, we conclude that the trial court properly applied MRE 804(b)(1), and did not abuse its discretion by admitting the preliminary examination testimony into evidence. As for Gigliotti's argument that the trial court's decision to admit the victim's preliminary examination nevertheless violated Gigliotti's constitutional right to confrontation, this Court has held, "Because MRE 804(b)(1) is a hearsay exception firmly rooted in American jurisprudence,

---

[3] We note that Gigliotti cites no caselaw for his assertion that, despite actually cross-examining the victim, he did not have "an opportunity" to cross-examine the victim because he did not have access to certain evidence that was later discovered. Despite Gigliotti's lack of citation to authority, we accept for purposes of this opinion that such an argument may have merit.

the Confrontation Clause is satisfied when the complainant's prior testimony is admitted because that testimony bears satisfactory indicia of reliability, without more." *Adams*, 233 Mich App at 659-660. Consequently, Gigliotti's constitutional argument fails.

## B. FAILURE TO GIVE JURY INSTRUCTION

Gigliotti next argues that the trial court abused its discretion when it declined to instruct the jury that the victim had made himself "unavailable" by refusing to testify at trial. We disagree.

### 1. STANDARDS OF REVIEW

"Questions of law, including questions of the applicability of jury instructions, are reviewed de novo." *People v Perez*, 469 Mich 415, 418; 670 NW2d 655 (2003). However, whether a certain instruction applies to the facts of a case is reviewed for an abuse of discretion. *People v Dupree*, 486 Mich 693, 702; 788 NW2d 399 (2010). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Warner*, 339 Mich App at 133.

### 2. ANALYSIS

"[J]ury instructions must include all elements of the charged offenses and any material issues, defenses, and theories that are supported by the evidence." *People v McKinney*, 258 Mich App 157, 163; 670 NW2d 254 (2003). According to Gigliotti, the reason the victim was unavailable was material to his credibility, and the trial court was therefore required to instruct the jury that the victim had made himself "unavailable." While it is clear that the victim refused to testify, the reasons for the victim's refusal are unknown. If the victim refused to testify because he falsified his allegations, this would undoubtedly reflect on his credibility. However, there could have been other reasons the victim refused to testify, such as fear. For instance, the record reflects that Williams wanted third parties to encourage the victim not to appear at trial, and the victim's DNA was found on the handle of the knife that likely caused Thurman's death. Either of these facts could have made the victim fearful about what may happen to him if he testified, and refusing to testify out of fear would not reflect on the victim's credibility. Accordingly, because there is no evidence as to why the victim refused to testify, defendant's argument that the reason for his unavailability was material to his credibility is not necessarily true. On such a record, we are compelled to conclude that the trial court's refusal to give the requested instruction did not fall outside the range of reasonable principled outcomes.[4]

---

[4] Gigliotti also argues that his constitutional right to present a defense was violated by the trial court's refusal to instruct the jury that the victim made himself "unavailable," and his right to confrontation was likewise violated by this alleged error. However, Gigliotti fails to cite relevant authority or explain or rationalize the basis of his arguments in a meaningful manner, rendering these arguments abandoned. See *Kelly*, 231 Mich App at 640-641.

## C. MRE 404(b) EVIDENCE

Next, Gigliotti argues that the trial court abused its discretion by admitting MRE 404(b) evidence. We conclude that, even if the MRE 404(b) evidence was wrongly admitted, Gigliotti is not entitled to relief.

### 1. STANDARD OF REVIEW

A trial court's decision to admit evidence is reviewed for an abuse of discretion. *Gursky*, 486 Mich at 606. "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Warner*, 339 Mich App at 133. A defendant is not entitled to relief on the ground that evidence was improperly admitted unless the defendant shows "that it is more probable than not that the error was outcome determinative." *People v Lyles*, 501 Mich 107, 117-118; 905 NW2d 199 (2017) (quotation marks and citation omitted). "In making this determination, the reviewing court should focus on the nature of the error in light of the weight and strength of the untainted evidence." *Id*. at 118 (quotation marks and citation omitted).

### 2. ANALYSIS

Assuming without deciding that the MRE 404(b) evidence was improperly admitted, we conclude Gigliotti is not entitled to relief given the weight and strength of the untainted evidence presented against him at trial. Testimony at trial established that, on the evening of June 23, 2020, or the early morning hours of June 24, 2020, Williams mentioned "hitting a lick" while he and Gigliotti were at Thurman's home in Detroit. According to Dillon, both Gigliotti and Williams discussed the need to "re-up" their ecstasy pills. Smith, who knew the victim, arranged to meet the victim in Port Huron Township under the guise of purchasing ecstasy, when in reality, Smith and Williams had agreed to rob the victim of the ecstasy. Williams, Thurman, Dillon, and Gigliotti picked up Smith in a red Cadillac, and all five traveled to meet the victim.

Testimony established that Gigliotti was in possession of a pellet gun in the Cadillac, and Williams possessed a knife. Smith was shown both weapons. When they reached Port Huron Township, Gigliotti agreed to lie in wait to rob the victim. Money was collected so it could be displayed to the victim. Smith arranged for the victim to meet him, and Gigliotti got out of the Cadillac before the victim arrived and hid behind a nearby trailer. After the victim approached the Cadillac, Thurman sent a thumbs up emoji to Gigliotti. According to Dillon, Gigliotti came out from behind the trailer and grabbed the victim. Smith testified that the victim was pulled out of the Cadillac. An altercation ensued, and Williams exited the Cadillac. Thurman later questioned what was taking so long and exited the Cadillac as well.

When Thurman and Williams returned to the Cadillac, Gigliotti was with them. Thurman had been stabbed, and Williams had blood on his clothes. Gigliotti had injuries to one of his hands, which required sutures. Gigliotti's hands were bloody, which supports he used a knife. Gigliotti, Williams, Dillon, Thurman, and Smith all fled the scene in the Cadillac. Surveillance video showed that, a short period of time later, the pellet gun was disposed of at a nearby gas station, and Gigliotti replaced Thurman as the driver of the Cadillac. Testimony from those in the Cadillac established that Smith instructed the others in the Cadillac to say that Thurman was stabbed while

attempting to buy or sell marijuana. Officers pulled over the Cadillac shortly after it stopped at the gas station. Officers involved in the stop testified that Gigliotti was calm, which supports that he was not surprised by the violent altercation that occurred during the course of the armed robbery. The victim suffered multiple stab wounds and had pellets in his body. After the attack, the victim had low blood pressure and a low heart rate. He was ranked as a "priority one trauma," and required sutures. The victim remained in the hospital for five days.

Taken together, this untainted evidence supports that Gigliotti used a dangerous weapon in the course of attempting to take the victim's personal property. See *People v Chambers*, 277 Mich App 1, 7; 742 NW2d 610 (2007) (outlining the elements of armed robbery). The fact that it is unclear if Gigliotti was actually able to take the victim's personal property is immaterial. See MCL 750.530(2) (" '[I]n the course of committing a larceny' includes acts that occur in an attempt to commit the larceny . . . ."). The untainted evidence also supports that Gigliotti entered into an agreement with multiple people to commit armed robbery, and that he assaulted the victim and intended "to do serious injury of an aggravated nature." See *People v Jackson*, 292 Mich App 583, 588; 808 NW2d 541 (2011) ("A criminal conspiracy is a partnership in criminal purposes, under which two or more individuals voluntarily agree to effectuate the commission of a criminal offense."); *People v Brown*, 267 Mich App 141, 147, 703 NW2d 230 (2005) (explaining that the intent to do great bodily harm less than murder is "an intent to do serious injury of an aggravated nature") (quotation marks and citation omitted). Accordingly, in light of the strength and weight of the untainted evidence establishing that Gigliotti actually committed the offenses for which he was convicted, we conclude that any error concerning the MRE 404(b) evidence was not outcome determinative. See *Lyles*, 501 Mich at 117-118.

## D. FAILURE TO CORRECT ALLEGED PERJURED TESTIMONY

Gigliotti next argues that his right to due process was violated because the prosecutor failed to correct the perjured testimony of Smith, Dillon, and the victim. We disagree.

### 1. PRESERVATION AND STANDARD OF REVIEW

Gigliotti did not raise this issue before the trial court, so it is unpreserved. See *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). "This Court reviews unpreserved constitutional issues for plain error affecting a party's substantial rights." *People v Swenor*, 336 Mich App 550, 564; 971 NW2d 33 (2021). To establish plain error affecting substantial rights:

> 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings. It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice. Finally, once a defendant satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*People v Carines*, 460

Mich 750, 763-764; 597 NW2d 130 (1999) (alteration in original; quotation marks and citations omitted).]

## 2. ANALYSIS

"It is well settled that a conviction obtained through the knowing use of perjured testimony offends a defendant's due-process protections guaranteed under the Fourteenth Amendment." *People v Aceval*, 282 Mich App 379, 389; 764 NW2d 285 (2009). "[T]he prosecution has an affirmative duty to correct false testimony[.]" *People v Smith*, 498 Mich 466, 476; 870 NW2d 299 (2015). "The responsibility does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Id*. (quotation marks and citation omitted). "If a conviction is obtained through the knowing use of perjured testimony, it must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Aceval*, 282 Mich App at 389 (quotation marks and citation omitted).

Gigliotti essentially argues that the prosecutor allowed Dillon, Smith, and the victim to lie on the stand. To support this argument, Gigliotti highlights inconsistencies in their testimonies, such as whether the victim got in the Cadillac and, if so, when the victim got out of the Cadillac. However, the inconsistencies do not necessarily mean their testimonies were false. Indeed, as noted by Gigliotti, the victim, Smith, and Dillon admitted that they had memory issues. Other inconsistencies highlighted by Gigliotti—such as the fact that Smith and Dillon agreed that they initially lied to Detective Wade—suggest that any lies they told were in their previous statements, not their trial testimony. Moreover, to the extent that any witnesses' previous statement irreconcilably conflicted with their trial testimony (meaning that one of the witness's statements was necessarily untruthful), that issue goes to the witness's credibility and the weight to be afforded to the witness's statements. Those determinations are to be made by the fact finder, and do not necessarily support that the witnesses provided false testimony at trial. Accordingly, Gigliotti has failed to establish that the prosecutor knowingly presented perjured testimony, and, therefore, he cannot establish plain error. See *Aceval*, 282 Mich App at 389.

## E. VERDICT AGAINST THE GREAT WEIGHT OF THE EVIDENCE

Gigliotti next argues that he should receive a new trial because the great weight of the evidence failed to show that he committed the charged crimes. We disagree.

## 1. PRESERVATION AND STANDARD OF REVIEW

Gigliotti did not raise this issue before the trial court, so it is unpreserved. See *Thorpe*, 504 Mich at 252. Unpreserved issues are reviewed for plain error affecting substantial rights. *Swenor*, 336 Mich App at 564.

## 2. ANALYSIS

In evaluating whether a verdict is against the great weight of the evidence, the question is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. *People v Unger*, 278 Mich App 210, 232; 749 NW2d 272 (2008).

-10-

Conflicting testimony and questions of witness credibility are generally insufficient grounds for granting a new trial. Absent exceptional circumstances, issues of witness credibility are for the trier of fact. The hurdle that a judge must clear in order to overrule a jury and grant a new trial is unquestionably among the highest in our law. [*Id*. (quotation marks and citations omitted).]

The exceptional circumstances include: (1) "the testimony contradicts indisputable physical facts or laws"; (2) the "testimony is patently incredible or defies physical realities"; (3) "a witness's testimony is material and is so inherently implausible that it could not be believed by a reasonable juror"; and (4) "the witnesses['] testimony has been seriously impeached and the case marked by uncertainties and discrepancies." *People v Lemmon*, 456 Mich 625, 643-644; 576 NW2d 129 (1998) (quotation marks and citations omitted).

Despite the presence of conflicting testimony in this case, the evidence does not preponderate so heavily against the jury's verdict that it would be a miscarriage of justice to allow the verdict to stand. Gigliotti's great-weight argument is essentially an attack on the sufficiency of the evidence, and allegations that the victim, Smith, and Dillon are not credible. However, it was up to the jury to assess the weight and reliability of the evidence, and, "absent exceptional circumstances, issues of witness credibility are for the jury[.]" *Id*. at 642.

None of the exceptional circumstances listed above were present in this case. While the testimony of Smith, the victim, and Dillon conflicted at times, there were also similarities in their testimony on material issues, such as the fact that Gigliotti was outside the Cadillac when the victim was stabbed and shot. It is also undisputed that Gigliotti was with Williams, Smith, Dillon, and Thurman at all relevant times and suffered an injury to his hand, which supports that he participated in stabbing the victim. Thus, Gigliotti's argument that the testimony of Smith, Dillon, and the victim was "patently incredible" or "inherently implausible" is unsupported. Although the victim, Smith, and Dillon were impeached, their testimony was not "seriously impeached," and the case was not "marked by uncertainties and discrepancies." See *id*. at 644 (quotation marks and citation omitted). Accordingly, we conclude that the jury's verdict was not against the great weight of the evidence.

## F. ASSISTANCE OF COUNSEL

Gigliotti next argues that his trial counsel provided ineffective assistance when his counsel failed to move for a mistrial after a potential juror, who was a United States Customs and Protection Officer, commented during jury selection that Gigliotti's name had "come across his desk" in "unrelated cases." We conclude Gigliotti is not entitled to relief.

### 1. PRESERVATION AND STANDARD OF REVIEW

Generally, whether a defendant has been denied effective assistance of counsel is a mixed question of fact and law—the trial court's factual findings are reviewed for clear error, while the court's ultimate ruling on whether a defendant received effective assistance of counsel is reviewed de novo. *People v Haynes*, 338 Mich App 392, 429; 980 NW2d 66 (2021). "Defendant, however, failed to obtain an evidentiary hearing to expand the record, so there are no factual findings to

which this Court must defer, and this Court's review is instead limited to errors apparent on the record." *Id.*

## 2. ANALYSIS

To establish a claim of ineffective assistance, "a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

Gigliotti argues that his counsel was ineffective because he failed to move for a mistrial after certain statements were made by a prospective juror during jury selection. When the prospective juror was asked if he knew trial counsel, Detective Wade, Gigliotti, or Williams, the prospective juror responded:

> I know Detective Wade and [the prosecutor]. I work for—I'm a [United States] Customs and Protection Officer and I'm assigned to Port Huron [Police Department's] Major Crime Unit so I've worked with both of them on previous cases. I also know the Defendants, their names have come across my desk on unrelated cases.

Although Gigliotti's trial counsel exercised a preemptory challenge to dismiss this prospective juror, Gigliotti argues that his trial counsel was ineffective for failing to move for a mistrial. Courts should generally only consider granting mistrials if an irregularity occurs "that is prejudicial to the rights of the defendant . . . and impairs his ability to get a fair trial." *People v Alter*, 255 Mich App 194, 205; 659 NW2d 667 (2003) (quotation marks and citation omitted; alteration in original). Even then, a mistrial should only be declared "where the error complained of is so egregious that the prejudicial effect can be removed in no other way." *People v Caddell*, 332 Mich App 27, 37; 955 NW2d 488 (2020) (quotation marks and citation omitted).

According to Gigliotti, the prospective juror's statement constituted misconduct and violated his right to a fair trial. The United States Constitution and the Michigan Constitution both guarantee the right of a criminal defendant to receive due process of law. US Const, Am XIV; Const 1963, art 1, § 17. "Implicit in this guarantee is that each criminal defendant enjoys the right to a fair trial, and essential to a fair trial is the defendant's right to be presumed innocent." *People v Horton*, 341 Mich App 397, 401; ___ NW2d ___ (2022). "Under the presumption of innocence, guilt must be determined solely on the basis of the evidence introduced at trial rather than on official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Id.* (quotation marks and citation omitted).

This Court has held jury misconduct does "not warrant relief unless the misconduct was such that it affected the impartiality of the jury or disqualified them from exercising the powers of reason and judgment." *Haynes*, 338 Mich App at 415. "[J]urors are presumed to be . . . impartial, until the contrary is shown." *People v Miller*, 482 Mich 540, 550, 759 NW2d 850 (2008) (alteration in original; quotation marks and citation omitted). "The burden is on the defendant to establish that the juror was not impartial or at least that the juror's impartiality is in reasonable doubt." *Id.*

In *Haynes*, 338 Mich App at 410, this Court considered whether "comments made by prospective jurors during voir dire about those jurors' biases tainted the jury, warranting a mistrial." This Court ultimately determined that the defendant failed to show that "the remarks by some of the prospective jurors had any effect on the impartiality of the jury." *Id.* at 415. The *Haynes* Court explained:

> Counsel for both parties asked each of the prospective jurors selected to replace the prospective jurors who were removed whether they could decide the case on the facts and follow the trial court's instructions. Each juror agreed that they could. The trial court also administered an oath to the jurors, and they each swore to "justly decide the questions submitted" to them, to render "a true verdict," and to render that verdict "only on the evidence introduced and in accordance with the instructions of the Court." Finally, the trial court instructed the jurors that they were to decide the case on the basis of the admitted evidence and not on the basis of any biases, sympathy, or prejudice and that they should not consider the fact that defendant had been charged with more than one crime. Jurors are presumed to follow their instructions, and are presumed to be impartial[.] [*Id.* at 415-416 (citations omitted).]

Like in *Haynes*, the trial court in this case instructed the members of the jury, both before and after they were empaneled, of their responsibilities to remain impartial. They were also instructed about what does and does not constitute evidence. The trial court also administered an oath to the jurors, where they swore to "render a true verdict" based "only on the evidence introduced and in accordance with the instructions of the Court." During final instructions, the jury was instructed to only consider the evidence, and the court again explained what does and does not constitute evidence.

While Gigliotti claims that the prospective juror's statement about Gigliotti biased the members of the jury to believe Gigliotti was a bad person and impacted their verdict, he has presented no evidence rebutting the presumption that jurors follow their instructions. See *Haynes*, 338 Mich App at 416. There is also nothing in the record to support that any empaneled juror considered the prospective juror's statements while deliberating. In short, Gigliotti has failed to show that the jury was "not impartial or at least that the juror's impartiality is in reasonable doubt." See *Miller*, 482 Mich at 550. Accordingly, moving for a mistrial would have been futile, and the failure of Gigliotti's trial counsel to make such a motion does not constitute ineffective assistance. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

G. ADMISSION OF STATEMENTS OF COCONSPIRATORS INTO EVIDENCE

Gigliotti next argues that the trial court improperly admitted Facebook messages between Williams and Smith into evidence under MRE 801(d)(2)(E) because there was no independent proof that Gigliotti was involved in the conspiracy between Williams and Smith, or any other conspiracy. According to Gigliotti, the messages between Williams and Smith amount to inadmissible hearsay. We disagree.

-13-

## 1. STANDARD OF REVIEW

A trial court's decision to admit evidence is reviewed for an abuse of discretion. *Gursky*, 486 Mich at 606. "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Warner*, 339 Mich App at 133.

## 2. ANALYSIS

As previously stated, hearsay is a statement, other than the one made by the declarant while testifying, offered into evidence to prove the truth of the matter asserted. MRE 801(c). Hearsay is inadmissible except as provided by the rules of evidence. MRE 802. MRE 801(d)(2) provides that an admission by a party-opponent is not hearsay. As relevant here, subsection (E) provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy on independent proof of the conspiracy" is not hearsay. MRE 801(d)(2)(E).

As the proponent of the statements, the prosecution had the burden to demonstrate by a preponderance of the evidence that the statements it offered fell within the exception stated in MRE 801(d)(2)(E). See *People v Martin*, 271 Mich App 280, 316; 721 NW2d 815 (2006). This Court in *Martin* explained that the proponent must satisfy three requirements in order to qualify a statement under MRE 801(d)(2)(E):

> First, the proponent must establish by a preponderance of the evidence that a conspiracy existed through independent evidence. A conspiracy exists where two or more persons combine with the intent to accomplish an illegal objective. It is not necessary to offer direct proof of the conspiracy. Instead, it is sufficient if the circumstances, acts, and conduct of the parties establish an agreement in fact. Circumstantial evidence and inference may be used to establish the existence of the conspiracy. Second, the proponent must establish that the statement was made during the course of the conspiracy. The conspiracy continues until the common enterprise has been fully completed, abandoned, or terminated. Third, the proponent must establish that the statement furthered the conspiracy. The requirement that the statement further the conspiracy has been construed broadly. Although idle chatter will not satisfy this requirement, statements that prompt the listener, who need not be one of the conspirators, to respond in a way that promotes or facilitates the accomplishment of the illegal objective will suffice. [*Martin*, 271 Mich App at 316-317 (quotation marks and citations omitted).]

On appeal, Gigliotti argues that the prosecutor failed to establish by a preponderance of the evidence that a conspiracy existed through independent evidence, i.e., the first requirement. In addressing this argument, we consider the evidence presented at the preliminary examination because that was the evidence already presented to the trial court when it denied Gigliotti's motion to exclude the Facebook communications between Smith and Williams.

At the preliminary examination, Detective Wade testified that Thurman, Williams, and Gigliotti had been communicating with each other on Facebook messenger in the time leading up to the crimes. Smith and Williams had also been communicating with each other through Facebook messenger. The victim testified that Smith contacted him on June 24, 2020, and they

arranged for Smith for purchase ecstasy pills from him. The victim provided Smith with a Dixon Street address. One of Thurman's phones, which was seized during the investigation, revealed that an address in the area of "Dixon and the 25th, 26th [Street]" was entered into "his maps." A photograph and videos of Smith and Williams posing with what appeared to be "a silver revolver" were located on the phone associated with Smith, which was also seized. The photograph and videos were saved on June 24, 2020, at 3:18 a.m. According to the victim, Smith contacted him when he arrived in Port Huron Township. When the victim approached the Cadillac on foot, he saw that it contained a female, a Caucasian male, Smith, and an African American male. At 4:10 a.m., the user of Thurman's phone sent a thumbs up emoji to the user of Gigliotti's phone. According to the victim, Gigliotti came out from behind a nearby trailer, approached him from behind while the victim was standing outside the Cadillac, and stabbed him. This evidence was sufficient to establish by a preponderance of the evidence that there was a conspiracy to commit armed robbery, and Gigliotti was part of the conspiracy. See *Martin*, 271 Mich App at 316-317.

Gigliotti argues that there is no evidence that he was part of the conspiracy *at the time the text messages were sent*, and, because one having no knowledge of a conspiracy is not a coconspirator, see *People v Blume*, 443 Mich 476, 484; 505 NW2d 843 (1993), the messages were inadmissible against Gigliotti. Problematically, Gigliotti has cited no authority in support of his assertion that he was required to have knowledge of the conspiracy at the time the messages were sent for MRE 801(d)(2)(E) to be applicable. Rather, the prosecution was only required to establish that a conspiracy existed and that Gigliotti was a part of it. Even if Gigliotti was not a part of the conspiracy initially, a defendant may become a member of an already existing conspiracy if he "cooperates knowingly to further the object of the conspiracy . . . ." *People v Huey*, 345 Mich 120, 125; 75 NW2d 893 (1956). The prosecution presented sufficient evidence to establish that, even if Gigliotti did not know about the conspiracy when the messages were sent, Gigliotti became a member of the conspiracy through his subsequent actions. Accordingly, we conclude that the trial court did not abuse its discretion by admitting the contested statements under MRE 801(d)(2)(E).

## H. SUFFICIENCY OF THE EVIDENCE

Gigliotti next argues that the prosecution failed to present sufficient evidence to support his conspiracy-to-commit-armed-robbery conviction. We disagree.

### 1. STANDARDS OF REVIEW

A challenge to the sufficiency of the evidence is reviewed de novo. *People v Henry*, 315 Mich App 130, 135; 889 NW2d 1 (2016). When reviewing a challenge to the sufficiency of the evidence, the evidence is viewed in the light most favorable to the prosecutor, and this Court must consider whether, based on that evidence, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015) (quotation marks and citation omitted). "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016).

-15-

## 2. ANALYSIS

MCL 750.157a states: "Any person who conspires together with 1 or more persons to commit an offense prohibited by law . . . is guilty of the crime of conspiracy . . . ." "A criminal conspiracy is a partnership in criminal purposes, under which two or more individuals voluntarily agree to effectuate the commission of a criminal offense." *Jackson*, 292 Mich App at 588. "The gist of conspiracy lies in the illegal agreement; once the agreement is formed, the crime is complete." *People v Seewald*, 499 Mich 111, 117; 879 NW2d 237 (2016) (quotation marks and citations omitted). "Direct proof of a conspiracy is not required; rather, proof may be derived from the circumstances, acts, and conduct of the parties." *Jackson*, 292 Mich App at 588 (quotation marks and citation omitted).

The evidence supports that Gigliotti, Smith, Williams, Thurman, and Dillon agreed to effectuate the commission of armed robbery. Williams and Gigliotti expressed the need to increase their ecstasy supply, and Williams talked about "hitting a lick" in Gigliotti's presence. Smith and Williams agreed to rob the victim, who they believed had ecstasy. Smith, who knew the victim, arranged to meet the victim in Port Huron Township under the guise of purchasing ecstasy. Williams, Thurman, Dillon, and Gigliotti picked up Smith, and all five traveled in a red Cadillac to meet the victim. While Smith and Gigliotti did not know each other before June 24, 2020, and Smith did not show Gigliotti his Facebook messages with Williams, it is well established that it is not necessary for a conspirator to know all of the other conspirators or to participate in all of the objects of the conspiracy. *People v Hunter*, 466 Mich 1, 7; 643 NW2d 218 (2002).

Smith denied that they discussed the plan before reaching Port Huron Township, and Dillon's testimony was unclear as to when the plan was discussed. However, there was evidence that Gigliotti was in possession of a pellet gun in the Cadillac—Gigliotti showed the pellet gun to Smith, which supports that Gigliotti was aware of the plan and the purpose of traveling to Port Huron Township. Additionally, Williams possessed a knife, which he showed to Smith. When they reached Port Huron Township, Gigliotti agreed to hide behind a nearby trailer in order to rob the victim. Money was collected so that it could be displayed to the victim. Smith arranged for the victim to meet him, and Gigliotti got out of the Cadillac before the victim arrived. According to Smith and Dillon, they remained in the Cadillac with Thurman and Williams. After the victim approached the Cadillac, Thurman sent a thumbs up emoji to Gigliotti. Gigliotti came out from behind the trailer and stabbed the victim. An altercation ensued, and Williams exited the Cadillac. Thurman later questioned what was taking so long and exited the Cadillac as well.

When Thurman and Williams returned to the Cadillac, Gigliotti was with them. Thurman had been stabbed, Williams had blood on his clothes, and the victim had multiple stab wounds and pellets in his body. Gigliotti had injuries to one of his hands, which required sutures. Gigliotti's hands were also bloody, which supports that Gigliotti assisted in carrying out the plan. Gigliotti, Williams, Dillon, Thurman, and Smith then fled the scene in the Cadillac. A short period of time later, the pellet gun was disposed of at a nearby gas station, and Gigliotti replaced Thurman as the driver of the Cadillac. While in the car, Smith instructed the others to say Thurman was stabbed while attempting to buy or sell marijuana. The officers who eventually stopped the Cadillac testified that Gigliotti was calm after the armed robbery was committed, which supports that he was not surprised by the violent altercation in which he was just involved.

-16-

When viewing all of this evidence in a light most favorable to the prosecution, the jury could have reasonably concluded beyond a reasonable doubt that Gigliotti entered into an agreement with multiple people to commit armed robbery. Although Dillon, Smith, and Thurman were not convicted of conspiracy to commit armed robbery, that is immaterial. See *People v Williams*, 240 Mich App 316, 325-327; 614 NW2d 647 (2000). Because there is sufficient evidence to support Gigliotti's conspiracy conviction, his due-process rights were not violated. See *People v Breck*, 230 Mich App 450, 456; 584 NW2d 602 (1998).

## I. SENTENCING

Gigliotti finally argues that the trial court improperly assessed 100 points for offense variable (OV) 3, MCL 777.33; and 10 points for OV 9, MCL 777.39. We disagree.

### 1. STANDARDS OF REVIEW

"This Court reviews for clear error a trial court's findings in support of a particular score under the sentencing guidelines but reviews de novo whether the trial court properly interpreted and applied the sentencing guidelines to the findings." *Haynes*, 338 Mich App at 435. "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made." *People v Blevins*, 314 Mich App 339, 348-349; 886 NW2d 456 (2016). The trial court's factual determinations "must be supported by a preponderance of the evidence." *People v Schrauben*, 314 Mich App 181, 196; 886 NW2d 173 (2016).

### 2. ANALYSIS

Gigliotti first argues that the trial court erred by assessing 100 points for OV 3, which is scored for "physical injury to a victim." MCL 777.33(1). One hundred points are assessed for OV 3 if "[a] victim was killed," MCL 777.33(1)(a), and the "death result[ed] from the commission of a crime," MCL 777.33(2)(b). "[F]or purposes of OV 3, the term 'victim' includes any person harmed by the criminal actions of the charged party." *People v Laidler*, 491 Mich 339, 348; 817 NW2d 517 (2012) (quotation marks and citation omitted). Courts can only "take into consideration [the] defendant's sentencing offense for purposes of scoring OV 3." *People v Biddles*, 316 Mich App 148, 165; 896 NW2d 461 (2016).

Thurman was the only person killed during the commission of the armed robbery. A coperpetrator can be considered a victim for purposes of OV 3, and MCL 777.33(2)(b) makes it "clear that the defendant's criminal actions must constitute a factual cause of a death for purposes of OV 3." *Laidler*, 491 Mich at 345, 349. Thus, whether the trial court properly assessed 100 points for OV 3 depends on the answer to the following question: but for Gigliotti's commission of a crime, would Thurman's death have occurred? See *id*. at 345.

Our answer to this question is guided by our Supreme Court's analysis in *Laidler*. There, the defendant and his accomplice attempted to break into a person's home. The prosecution's theory was that the defendant had boosted his accomplice up to the window of the home, which was six feet off of the ground, and when the homeowner saw the accomplice's hand extend inside the window, the homeowner shot and killed the accomplice. *Id*. at 341-342. The *Laidler* Court concluded that 100 points was properly assessed for OV 3 because "but for [the] defendant's

commission of a crime, his coperpetrator would not have been placed in the position in which he was shot and killed." *Id*. at 345. The fact that the homeowner's gunshot killed the accomplice did not alter this conclusion because the language of MCL 777.33 does not speak to only a single cause of death. *Id*. at 346.

As found by the trial court in this case, Gigliotti, Smith, Williams, and Thurman conspired to commit armed robbery. After Thurman drove them to the agreed upon location in the Cadillac, Gigliotti got out of the Cadillac and hid behind a trailer to wait for the victim. Gigliotti later approached the victim from behind and stabbed him. Thurman was in the Cadillac when this occurred. An altercation ensued outside the Cadillac for a period of time, which prompted Thurman to exit the Cadillac and participate in stabbing the victim. During the armed robbery, Thurman was stabbed in the chest and later died. Therefore, like in *Laidler*, "[b]ut for the instant criminal activity" Gigliotti "coperpetrated," Thurman would not "have been placed in the position in which he was [stabbed] and killed." *Id*. at 345. While Gigliotti is correct that there is no evidence of Gigliotti providing "specific assistance" or encouraging Thurman to exit the Cadillac, the relevant question is whether Gigliotti's criminal actions are "a factual cause of a death for purposes of OV 3." See *id*. at 345-346. We are not definitely and firmly convinced that the trial court made a mistake when it concluded that Gigliotti's criminal actions were a factual cause of Thurman's death for the reasons already discussed. Accordingly, the trial court did not err by assessing 100 points for OV 3.

With respect to OV 9, 10 points must be assessed for OV 9 if "[t]here were 2 to 9 victims who were placed in danger of physical injury or death . . . ." MCL 777.39(1)(c). Zero points must be assessed if "[t]here were fewer than 2 victims who were placed in danger of physical injury or death . . . ." MCL 777.39(1)(d). "[E]ach person who was placed in danger of physical injury" is to be counted as a victim. MCL 777.39(2)(a).

A preponderance of the evidence supports that the victim, Thurman, Williams, Smith, and Dillon were placed in danger of physical injury while the armed robbery was being committed. Indeed, a preponderance of the evidence supports that Gigliotti used a knife during the commission of the crime while the victim, Williams, Thurman, Dillon, and Smith were present. See *People v Sargent*, 481 Mich 346, 350; 750 NW2d 161 (2008); *People v Morson*, 471 Mich 248, 253, 261-262, 685 NW2d 203 (2004).

Although Williams, Smith, Thurman, and Dillon were Gigliotti's coconspirators, we agree with the trial court that the logic outlined in *Laidler* applies equally to OV 9. When determining whether a coperpetrator can be considered a victim for purposes of OV 3, the *Laidler* Court first turned to the dictionary definition of "victim." See *Laidler*, 491 Mich at 347. The Court noted, "One representative definition provides that a 'victim' is 'a person who suffers from a destructive or injurious action or agency[.]' " *Id*. at 347-348 (alteration in original; citation omitted). The *Laidler* Court then reasoned:

> Because OV 3 is concerned with criminal punishment, and because MCL 777.33(2)(b) instructs the court to "[s]core 100 points if death results from the commission of a crime," the injurious action must be criminal and the action must be that of the party whose punishment is at issue, in this case, defendant. Thus,

pursuant to common, and relevant, usage, a "victim" is any person who is harmed by the defendant's criminal actions. [*Id*. at 348.]

Like OV 3, OV 9 is concerned with criminal punishment. Additionally, because MCL 777.39(2)(a) instructs that "each person who was placed in danger of physical injury" is to be counted as a victim, "the injurious action must be criminal and the action must be that of the party whose punishment is at issue . . . ." *Laidler*, 491 Mich at 348. Consequently, the plain language of OV 9 contemplates that a victim is any person who is placed in danger during the commission of the sentencing offense. Given this broad definition, a coperpetrator can be a "victim" for purposes of assessing points to OV 9. Because "[t]here were 2 to 9 victims who were placed in danger of physical injury or death" during the commission of the armed robbery, the trial court properly assessed 10 points for OV 9. See MCL 777.39(1)(c).

In sum, the trial court did not err when it assessed 100 points for OV 3 and 10 points for OV 9. However, we find it necessary to remand Gigliotti's case to the trial court for the ministerial task of correcting Gigliotti's judgment of sentence, which currently reflects that Gigliotti was convicted of two counts of armed robbery, as opposed to one count of armed robbery and one count of conspiracy to commit armed robbery. See MCR 7.217(A)(7).

## III. DEFENDANT WILLIAMS (DOCKET NO. 359429)

Williams argues that the prosecution failed to present sufficient evidence to support his armed-robbery conviction. We disagree.

## A. STANDARDS OF REVIEW

A challenge to the sufficiency of the evidence is reviewed de novo. *Henry*, 315 Mich App 130, 135; 889 NW2d 1 (2016). When reviewing a challenge to the sufficiency of the evidence, the evidence is viewed in the light most favorable to the prosecutor, and this Court must consider whether, based on that evidence, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. *Smith-Anthony*, 494 Mich at 676. "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *Bailey*, 310 Mich App at 713 (quotation marks and citation omitted). "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *Blevins*, 314 Mich App at 357.

## B. ANALYSIS

In order to obtain a conviction of armed robbery, the prosecution must prove that:

(1) the defendant, in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally

-19-

or otherwise that he or she was in possession of a dangerous weapon. [*Chambers*, 277 Mich App at 7 (footnote omitted).]

While Williams argues that "there must be a taking of money or property from the victim's physical person or immediate presence" to effectuate an armed robbery, this argument is legally incorrect in Michigan. MCL 750.530(2) provides that " 'in the course of committing a larceny' includes acts that occur in an attempt to commit the larceny, or during commission of the larceny, or in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the property." Larceny, in turn, is "(a) a trespassory taking and (b) the carrying away (c) of the personal property (d) of another (e) with intent to steal that property." *People v March*, 499 Mich 389, 401; 886 NW2d 396 (2016).

Williams does not argue that there was insufficient evidence to support beyond a reasonable doubt that he used force or violence against the victim. Rather, Williams argues that there was insufficient evidence to support that he committed larceny or attempted to commit larceny because the evidence supports that he was "aware" that the victim did not have property to steal, and there is no evidence that anything was stolen from the victim. We conclude that the evidence supported beyond a reasonable doubt that Williams attempted to commit larceny.

On the evening of June 23, 2020, and in the early morning hours of June 24, 2020, Williams expressed a desire to "re-up" his supply of ecstasy. Williams contacted Smith, who had purchased drugs from the victim in the past. After Smith negotiated a deal with the victim to purchase ecstasy from him in Port Huron Township, Williams and Smith agreed to rob the victim of the ecstasy. Additionally, Williams and Smith exchanged Facebook messages, noting that the victim would probably have money.

In the early morning hours of June 24, 2020, the victim agreed to meet Smith at the corner of 25th Street and Dixon Street. According to Torvik, the victim had methamphetamine on his person when he left Torvik's house to meet Williams and his coperpetrators.

Evidence supports that, when the victim got to the Cadillac, he got in and sat next to Williams and Dillon. Smith, who was in the front passenger seat, testified that he heard the victim say, "I got the stuff," while Dillon testified that the victim initially told Smith he did not "have anything on him." However, according to Dillon, the victim eventually pulled out a bag that contained a white substance. Dillion testified that the victim told everyone in the car that the substance in the bag was "not salt," and someone tasted it. Further, at some point while the victim was still in the Cadillac, Dillon sent a text message to Thurman encouraging Thurman to take something from the victim. This evidence supports that the victim had drugs on his person when he was in Williams' presence and that Williams, who was in close proximity to the victim, was aware of this. Additionally, Torvik testified that the victim gave him $200 in cash and "a gram, a gram and a half" of methamphetamine after the victim was stabbed. Further, Thomas testified that the victim gave her his wallet, which contained $50, after he was stabbed. While the victim denied that he had any narcotics on his person during his testimony at the preliminary examination, the victim expressed multiple times after the stabbing that he was attempting to purchase drugs. This supports the victim, at the very least, had money on his person, which was confirmed by both Torvik and Thomas.

When viewing all of the evidence in a light most favorable to the prosecution, the jury could have reasonably concluded beyond a reasonable doubt that Williams attempted to commit larceny while using force or violence against the victim. Although the witnesses' testimony conflicted at times, conflicts in evidence are to be resolved in favor of the prosecution. *People v Harrison*, 283 Mich App 374, 377-378; 768 NW2d 98 (2009). We also do not second-guess jury determinations regarding the weight of the evidence or the credibility of the witnesses. *Unger*, 278 Mich App at 222. Therefore, Williams is not entitled to the relief he seeks. However, we find it necessary to remand to the trial court for the ministerial task of correcting Williams' judgment of sentence, which currently reflects that Williams was convicted of two counts of armed robbery, as opposed to one count of armed robbery and one count of conspiracy to commit armed robbery. See MCR 7.217(A)(7).

Affirmed, but remanded for the ministerial task of correcting the judgments of sentence.


/s/ James Robert Redford
/s/ Colleen A. O'Brien
/s/ Kathleen A. Feeney